**ALABAMA POWER CO. v. McNINCH et al.,**
**Federal Power Commission.**

No. 6691.

United States Court of Appeals for the
District of Columbia.

Decided Sept. 27, 1937.

Modification of Decree and Mandate Denied Jan. 6, 1938.

H. C. Kilpatrick, of Washington, D. C., and Walter Bouldin, of Birmingham, Ala., for appellant.

Oswald Ryan and Dozier A. DeVane, both of Washington, D. C., for appellees.

Before ROBB, VAN ORSDEL, GRONER, and STEPHENS, Associate Justices.

STEPHENS, Associate Justice.

This is an appeal from a final decree of the Supreme Court of the District of Columbia dismissing the bill of complaint of the appellant Alabama Power Company (hereafter referred to as Power Company) after a trial on the merits. The bill sought to enjoin the enforcement of an order of the Federal Power Commission (hereafter referred to as Commission) requiring the Power Company to establish accounts showing the actual legitimate original cost of a hydro-electric project owned by the Power Company to be the sum determined by the Commission as such cost, and requiring the Power Company to establish and maintain subsidiary accounts and records to substantiate all entries making up such total cost.

The record in the case discloses the following facts: The Power Company is an Alabama corporation engaged in business in that State as an electric public utility. One of its generating plants is Mitchell Dam, a hydro-electric project on the Coosa River, a navigable stream. The dam and power house were built under a license issued by the Commission on June 27, 1921. Physical construction of the project was begun on August 1, 1921, and completed on August 15, 1923. After completion of the project, the Power Company, as required by the Federal Power Act, filed a verified, detailed, initial cost statement.

This showed a claimed initial cost of $10,646,056.76. Representatives of the Commission, after an audit, recommended disallowance of certain items. The Power Company protested, and a hearing on the disputed items was had before the Commission. Thereafter, in a written opinion, the Commission disallowed the following items, and ordered the Power Company to set up accounts showing the actual legitimate original cost as determined by the Commission:

| | |
|---|---:|
| 1. Taxes paid on project lands prior to July 1, 1918 | $ 227.45 |
| 2. Dixie Construction Company fee | 183,540.15 |
| 3. Interest on funds expended prior to 1918 on the project[2] | |
| 4. Electric energy used during construction | 42,128.04 |
| 5. Fixed capital not classified by prescribed accounts | 3,500,000.00 |

The Power Company filed an application for a rehearing by the Commission and a petition for modification of the Commission's ruling. The application for rehearing was denied; certain modifications of the Commission's order, not here material, were made. Before the time fixed for compliance with the order of the Commission this suit was begun. After the hearing upon the merits the lower court made findings of fact, and conclusions of law, and upon them dismissed the bill. There was undisputed evidence that to establish accounts as ordered would cost approximately $5,000, and that the only substantial difference between such accounts and those now maintained by the Power Company would be in the amounts involved in this suit.

The Federal Power Act creates a power commission and empowers it to fix the cost of a project, as follows:

"The Commission is hereby authorized and empowered—(b) To determine the actual legitimate original cost of and the net investment in a licensed project, and to aid the Commission in such determinations, each licensee shall, upon oath, within a reasonable period of time to be fixed by the Commission, after the construction of the original project, . . file with the Commission in such detail as the Commission may require, a statement in duplicate showing

---

[2] The Commission refused to allow interest prior to the construction period. It allowed interest during the construction period. The Commission and the Power Company agreed as to the rate of interest and the method of computing it. About $625,000 interest was allowed as a part of cost of the project.

the actual legitimate original cost of construction of such project, . . and of the price paid for water rights, right-of-way, lands, or interest in lands. . . . The statement of actual legitimate original cost of said project, and revisions thereof as determined by the Commission, shall be filed with the Secretary of the Treasury." [41 Stat. 1065, § 4, as amended by 41 Stat. 1353, 49 Stat. 839, § 202, 16 U.S.C.A. § 797, Supp.1936]

"Net investment" and "cost" are defined in the Act as follows:

"(13) 'net investment' in a project means the actual legitimate original cost thereof as defined and interpreted in the 'classification of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission', plus similar costs of additions thereto and betterments thereof, minus the sum of the following items properly allocated thereto, if and to the extent that such items have been accumulated during the period of the license from earnings in excess of a fair return on such investment: (a) Unappropriated surplus, (b) aggregate credit balances of current depreciation accounts, and (c) aggregate appropriations of surplus or income held in amortization, sinking fund, or similar reserves, or expended for additions or betterments or used for the purposes for which such reserves were created. The term 'cost' shall include, insofar as applicable, the elements thereof prescribed in said classification, . . and said classification of investment of the Interstate Commerce Commission shall insofar as applicable be published and promulgated as a part of the rules and regulations of the Commission; . . ." [41 Stat. 1063, § 3, as amended by 49 Stat. 838, § 201, 16 U.S. C.A. § 796(13), Supp. 1936]

Under Section 797 of Title 16, U.S.Code the Commission has power to issue preliminary permits for the purpose of enabling applicants for a license to secure necessary preliminary data and to comply with applicable state laws. Under Section 798 the preliminary permit is for the sole purpose of maintaining priority of application. for a license, for such period not exceeding three years as in the discretion of the Commission may be necessary for making examinations, surveys, estimates, and the like.

Under Section 799 the duration of a license may not exceed fifty years, and each license is conditioned upon acceptance by the licensee of all the terms and conditions of the Federal Power Act.

Section 803 provides:

"All licenses issued under Sections 791 to 823 of this title shall be on the following conditions:

*       *       *

"*Amortization reserves.* (d) That after the first twenty years of operation, out of surplus earned thereafter, if any accumulated in excess of a specified reasonable rate of return upon the net investment of a licensee in any project . . . under license, the licensee shall establish and maintain amortization reserves, which reserves shall, in the discretion of the Commission, be held until the termination of the license or be applied from time to time in reduction of the net investment. Such specified rate of return and the proportion of such surplus earnings to be paid into and held in such reserves shall be set forth in the license.

"*Annual charges payable by licensees* (e) That the licensee shall pay to the United States reasonable annual charges in an amount to be fixed by the Commission for the purpose of reimbursing the United States for the costs of the administration of this chapter; . . . and for the expropriation to the Government of excessive profits until the respective States shall make provision for preventing excessive profits or for the expropriation thereof to themselves, or until the period of amortization as herein provided is reached, and in fixing such charges the Commission shall seek to avoid increasing the price to the consumers of power by such charges, and any such charges may be adjusted from time to time by the Commission as conditions may require: . . ." [41 Stat. 1068, § 10(d, e), as amended by 49 Stat. 842, § 206, 16 U.S.C.A. § 803(d, e), Supp.1936]

and Section 807 provides:

"Upon not less than two years' notice in writing from the Commission the United States shall have the right upon or after the expiration of any license to take over and thereafter to maintain and operate any project . . . covered in whole or in part by the license, . . upon the condition that before taking possession it shall pay the net investment of the licensee in the project . . . taken, not to exceed the fair value of the property taken, plus such reasonable damages, if any, to property of the licensee valuable, serviceable, and depend-

ent . . . but not taken, as may be caused by the severance therefrom of property taken, and shall assume all contracts entered into by the licensee with the approval of the Commission. The net investment of the licensee in the project . . . so taken and the amount of such severance damages, if any, shall be determined by the Commission after notice and opportunity for hearing. Such net investment shall not include or be affected by the value of any lands, rights-of-way, or other property of the United States licensed by the 'Commission under this Act, by the license or by good will, going value, or prospective revenues; nor shall the values allowed for water rights, rights-of-way, lands, or interest in lands be in excess of the actual reasonable cost thereof at the time of acquisition by the licensee: . . ." [41 Stat. 1071, § 14, as amended by 49 Stat. 844, § 207, 16 U.S.C.A. § 807, Supp.1936][3]

Under these provisions it is clear that the Commission has authority to determine the actual legitimate original cost of a project and to require the licensee to set up his books showing the cost as thus determined. Cf. Clarion River Power Co. v. Smith, 61 App.D.C. 186, 59 F.2d 861, 1932, certiorari denied 287 U.S. 639, 53 S.Ct. 88, 77 L.Ed. 553, 1932. It is also clear that since "net investment" is computed upon a base of "original cost", the cost figure is important in its relation to amortization reserves, the expropriation of excessive profits, and the price to be paid by the United States if it takes over a project at or after the expiration of the license for such project.[4]

## I

As to the disallowance of $3,500,000, designated by the Power Company as "fixed capital not classified by prescribed accounts":

As early as 1900 the Coosa River was recognized as a valuable potential source of water power for the generation of electricity. In 1906 the Power Company was organized by local interests, with a paid-in capital of $5,000. Prior to July 28, 1913, the major portion of the lands here in-

volved, that is those comprising the Mitchell Dam project, were owned by the Power Company. Three other corporations, Alabama Power & Electric Company, Alabama Electric Company, and Wetumpka Power Company, each with small capital, were organized about the same time, to develop other locations on the river. The four companies were organized by somewhat conflicting interests, and their prospective dam sites were so located that high dams placed at some of them would flood out others. All four companies had prepared plans for the construction of hydro-electric projects and for the improvement of navigation, and had filed copies of the plans in the office of the Secretary of the State of Alabama, but such plans did not include until 1916 development at the site of Mitchell Dam. A dam constructed according to the plans for the development by Wetumpka Power Company of its site at Lock 15 would have backed water over the site of Mitchell Dam so as to make development of the present project impossible. The right of Wetumpka Power Company to impound water to this extent was not subject to condemnation under the existing laws of Alabama. Since the Coosa River was a navigable stream, however, it could not be obstructed without the consent of the Federal Government, and this consent was not forthcoming for some time.

The Alabama Traction, Light & Power Company, Ltd. (hereafter referred to as the Traction Company) was organized in 1912 for the purpose of developing the water power of the Coosa River. This was a Canadian corporation, designed to centralize the control of all the corporations which then had holdings of land at locations along the river valuable for hydroelectric purposes. In furtherance of the development of the river the Traction Company incurred substantial costs for financing, promotional, and engineering services. In 1912 the Traction Company in a single transaction acquired the outstanding capital stocks of the Alabama Power Company, Alabama Power & Electric Company and Wetumpka Power Company, paying there-

---

[3] In Section 797 "net investment" is defined as based upon "actual *legitimate* original cost." In section 807 the amount to be allowed for lands on taking of a project by the United States may not exceed "actual *reasonable* cost at the time of acquisition by the licensee." [Italics added] We think the terms "legitimate" and "reasonable" are intended to mean

the same thing, and no point is made in this case upon the difference in terminology in the sections.

[4] Although Section 807 provides for a hearing as to the amount of net investment at the time of the taking of the project by the United States, such investment would, by definition, be determined on a base of original cost as now fixed.

for $200,000 in cash, $200,000 face value of the Traction Company's first mortgage bonds, and $1,250,000 par value of the Traction Company's common stock. This payment was not allocated by the Traction Company—it was simply a sum paid for all the stock of the three companies as a unit. Subsequently, but prior to the date of the unification of the Coosa River companies in 1913, as later described, the Traction Company purchased the capital stocks of the Alabama Electric Company and the Alabama Power Development Company,[5] and certain assets owned and controlled by various individuals. Payments were largely made in Traction Company securities.

On July 28, 1913, the Alabama Power Company, the Alabama Electric Company, the Wetumpka Power Company, the Alabama Power & Electric Company, and the Alabama Power Development Company were unified into one corporation under the name of the Alabama Power Company. At the time of this unification substantially all of the stock of the constituent corporations mentioned was owned by the Traction Company. The merger agreement provided that each of the parties agreed:

"that the said Alabama Electric Company, the said Wetumpka Power Company, the said Alabama Power & Electric Company and the said Alabama Power Development Company shall be merged into and with the said Alabama Power company, under the names of Alabama Power Company, (hereinafter called the consolidated corporation) but which shall not be a new corporation, . . ."

One of the "terms and conditions" of the unification agreement was:

"Article VIII. It is the intention, purpose and agreement of the parties that the Alabama Power Company shall be and is hereby continued in existence as the consolidated corporation, and that a new corporation shall not be formed by this agreement, and that the existence of the consolidated corporation shall be perpetual."

The authorized capital stock of the Alabama Power Company subsequent to the merger was to be $20,000,000 represented by 200,000 shares. Of this authorized capital 99,750 shares were issued at the time of the merger. Seventy thousand of these shares, with a par value of $7,000,000, were issued to the holders of the 50 shares which comprised the total capital stock of the "original" Alabama Power Company in exchange for their stock; 69,980 were issued to the Traction Company, the remaining 20 shares to three individuals. Lesser amounts of the shares of the "new" Alabama Power Company were issued to the Traction Company in similar exchanges for the shares of the other constituent companies. The total properties involved in the merger had been appraised by engineers, and the merger agreement recited that the parties agreed that the shares of stock and assets owned by each of the constituent companies were of a value equal to the par value of the new shares to be issued in exchange for them.

The Power Company owned two dam sites, claimed to be of equal value.[6] It asserts that a new corporation was formed in the unification of 1913, that one-half of the $7,000,000 par value stock issued to the shareholders of the "original" Alabama Power Company by the "new" Alabama Power Company was properly allocable to the Mitchell Dam project, and that the par value of this one-half was therefore the cost to the "new" corporation of such site. This $3,500,000 described as "fixed capital not classified by prescribed accounts" is apparently intended to cover not only the cost of lands, but also the cost of water rights, the expense of promotion, preliminary engineering, and a proportionate part of other expense attendant upon hydroelectric development of the Coosa River prior to 1913.[7]

Under 16 U.S.C.A. § 797, the statement to be filed by the licensee upon completion of a project is to show the *price paid* for lands, water rights, and interest in lands. Under 16 U.S.C.A. § 807, the value allowed for lands on taking of the project by the United States may not be in excess of "actual reasonable cost thereof at the time of acquisition *by the licensee."* [Italics added] The Power Company obtained the license in 1921. If a new corporation was formed in 1913, the Alabama Power Com-

---

5 This corporation does not concern us since its holdings were upon a stream other than the Coosa River.

6 Cf. Lay v. Hohenberg, 200 Ala. 485, 76 So. 427, 1917.

7 Although a footnote in the Power Company's brief refers to the amount of $3,500,000 as "claimed as the cost of lands and water rights pertaining to the project", the brief and record as a whole indicate that the item included other costs, as described.

pany then created is the licensee, and the cost to the licensee of all the lands here involved was the price which it paid for them in the unification. If, on the other hand, the Power Company has had a continuous existence since the formation of the "original" Alabama Power Company in 1906, the cost to the licensee of all lands which it held prior to the unification of 1913 is the price paid by it on original acquisition irrespective of any 1913 value or any 1913 stock issue.

It is to be noted that the merger or consolidation of 1913 was not the unification of five corporations which represented conflicting interests. On the contrary, in view of the stock ownership, above described, of the Traction Company in the corporations involved, the purported surrender of stock in the constituent corporations and the issuance of new stock to the shareholders of such corporations was actually nothing more than a surrender by the Traction Company of the shares it held in five subsidiary corporations, and the issuance to the Traction Company of all the shares of the "new" Alabama Power Company. It might fairly be termed an apparent five party transaction which in reality involved but one party.

The Commission decided that no new corporation was formed in the unification of 1913 and that, therefore, the cost to the licensee Power Company of all the properties owned by it prior to 1913 was what had been paid for them upon original acquisition. These properties comprised almost all of the lands involved in the Mitchell Dam project, and the considerations paid by the Alabama Power Company on original acquisition were largely stipulated.

All the lands here involved were in two locations on the river: at Duncan's Riffle, now the site of Mitchell Dam, and at the old Lock 14 site which was flooded out by Mitchell Dam. Prior to the unification, the Alabama Power Company owned all this land, except a certain Parcel 214 at Lock 14. All the land at Lock 14, except Parcel 214, was acquired by the Power Company through eight conveyances between 1907 and 1912. The Commission and the Power Company stipulated that the considerations recited in six of these deeds were the actual considerations paid, and the Commission allowed these actual considerations as cost. As to the two deeds in which the recited consideration was nominal, the parties stip-ulated that substantial consideration had been paid, the amount and character of which was unknown and unascertainable. As the cost of the land conveyed by these two deeds the Commission allowed a figure which it estimated to have been fair market value at time of purchase, reaching the figure by a comparison of the tracts involved in these two deeds with the other lands conveyed on the basis of acreage and of other fractional interests conveyed in the same lands. The method of valuing Parcel 214 at Lock 14 is explained below. The lands at Duncan's Riffle, the present Mitchell Dam site proper, were known as Parcel 9. Three-quarters thereof were conveyed directly to the Power Company by private owners for actual considerations aggregating $5,785. This amount was allowed. The other one-quarter of the site had been conveyed directly to the Power Company when in 1912 and 1913 the Traction Company purchased certain assets of which this one-quarter of Parcel 9 was a part. The parties stipulated that this portion of Parcel 9 constituted in value one-third of the total assets so purchased. For the total assets in this purchase the Traction Company paid $58,500 cash, $25,000 face value of Traction Company bonds and $99,000 par value of its common stock. At the then market value of the securities this consideration totalled $116,643.80. The Commission allowed one-third of this, $38,-881.27, as the actual reasonable cost of the one-quarter of Parcel 9.

Parcel 214 at Lock 14 had been owned by Alabama Power & Electric Company, and the Commission conceded that ownership of this parcel had passed to the Alabama Power Company in the unification. The parcel comprised a small portion of the properties of the Alabama Power & Electric Company, and in the unification of 1913 the Traction Company, holder of all the shares in Alabama Power & Electric Company, was issued $25,000 par value stock in exchange for the shares of Alabama Power & Electric Company. In determining the value of the parcel, the Commission disregarded the value placed upon it in the unification and sought to find actual market value. The Commission looked to the price which had been paid by the Traction Company for all the stock of the Alabama Power & Electric Company in 1912. Payment by the Traction Company had been made in cash and securities, and the Commission looked to market value, which had been stipulated, rather than to the par value

of these stocks and bonds. Thus it computed the total market value of the securities given by the Traction Company, together with some cash, in exchange for complete ownership of the Alabama Power & Electric Company, and then allocated a proportionate part of the sum thus found to Parcel 214. The result obtained was approximately $23,000.[8]

In its petition for rehearing the Power Company asserted that this parcel had been in fact owned by the Alabama Power Company prior to the unification of 1913. The Commission refused to allow a rehearing upon the ground that it was not shown that a revaluation of the parcel on this basis would increase the amount allowed for it as original cost.

The Commission's final determination of the total cost of lands involved in the Mitchell Dam project was as follows:

Lock 14 (except Parcel 214).................. $ 8,612.07
[6 conveyances in which actual consideration was recited, 2 conveyances in which the Commission in the absence of evidence had estimated fair market value at the time of acquisition by the Power Company]

Parcel 214 ...................................... 22,856.75
[Acquired in the unification; valued on the basis of what the Traction Company had paid in 1912]

Parcel 9 (three-quarters thereof)........:... 5,785.00
[Actual cost to the Power Company in 1912]

Parcel 9 (remaining one-quarter thereof)... 38,881.27
[Actual price paid by the Traction Company in 1912, computed upon cash, and market value of securities exchanged]

Total ...................................... $76,135.09

We are faced with the question whether the licensee Power Company is a new corporation created in 1913 by the consolidation of five companies or the original Alabama Power Company formed in 1906, into which four other companies were merged in 1913. If the former is the case the lands here involved were necessarily acquired in 1913, since the corporate licensee did not exist prior to 1913, and it would follow that the Commission's allowance for cost of land was erroneous. If, on the other hand, the transaction of 1913 was a merger through which the Alabama Power Company, formed in 1906, preserved its identity unchanged, then the cost of the lands acquired prior to 1913 should be reckoned on the basis of what they cost the Alabama Power Company at the time of original acquisition.

Whether a new corporation was formed is a question of state law. Atlantic & Gulf Railroad Company v. Georgia, 98 U.S. 359, 25 L.Ed. 185, 1878; Wabash, St. Louis & Pac. Ry. Co. v. Ham, 114 U.S. 587, 5 S.Ct. 1081, 29 L.Ed. 235, 1885; see 8 Thompson, Corporations, 3d Ed. 1927, §§ 6012, 6016, semble.

The unification of the five corporations in 1913 was effected under Sections 3502–3508, inclusive, of the 1907 Code of Alabama. [Now Sections 7037–7044 of the 1928 Code of Alabama.] Section 3502 provides:

"Corporations may consolidate or merge.—Any two or more corporations

[8] This allowance of approximately $23,000 for Parcel 214 was substantially larger in amount than the figure which would have been reached if the Commission had adopted the valuation placed upon the parcel in the unification. Alabama Power & Electric Company had paid $990.40 for Parcel 214. It was part of the assets involved in the acquisition by the Traction Company in 1912 of the Alabama Power Company, the Alabama Power & Electric Company, and the Wetumpka Power Company. The Traction Company paid for this acquisition cash and securities of the Traction Company which, at the then market valuation of the securities, aggregated $882,500. One-fourth of this consideration was allocable to the land and water power rights at Lock 14, then owned by the Alabama Power Company and the Alabama Power & Electric Company. Parcel 214 represented in area 6.2% of the Lock 14 properties. Upon this area basis its cost to the Traction Company would have been 6.2% of $220,625—$13,678.75. The cost of Parcel 214 to the Alabama Power & Electric Company ($990.40) was 10.36% of the total cost of the Lock 14 properties to the pre-merger companies ($9607.47). The Commission used the higher percentage, and allowed 10.36% of $220,625—$22,856.75—as the cost of Parcel 214.

The Alabama Power & Electric Company owned at two other sites upon the Coosa River lands aggregating several times the area of Parcel 214, in addition to its ownership of Parcel 214 at the Lock 14 site. In the unification $25,000 par value of Alabama Power Company stock was exchanged for all the stock of the Alabama Power & Electric Company. If a portion of $25,000 proportionate to the relation of Parcel 214 of the entire assets of the Alabama Power & Electric Company had been allowed, it would obviously have been less than $22,856.75.

which are authorized to consolidate may merge or consolidate into a single corporation, which may be either one of the consolidated corporations or a new corporation to be formed by means of such merger or consolidation; in either event such consolidation shall be effected in the manner following."

Section 3503 provides how a consolidation or merger of corporations may be effected. It provides in part:

"Consolidations or merger of corporations, how effected.—The directors of the several corporations proposing to *merge or consolidate* may enter into joint agreement under the corporate seals of the respective corporations, prescribing the terms and conditions thereof, the mode of carrying the same into effect, the name and principal place of business in this state of *the new corporation (if one shall be formed or created) or of the consolidated corporation, as the case may be;* the number, names, and postoffice addresses of the first directors and officers of the new consolidated corporation; the number of shares of the capital stock, both common and preferred, the par value of each share thereof, and the manner and terms of converting the capital stock of each of *the merging or consolidating* corporations into the stock or obligations of such *new or consolidated* corporation, and how and when the directors and officers of such *new or consolidated* corporation shall be chosen, together with all such other provisions · or details as the directors of the several *consolidating or merging* corporations may deem necessary to perfect such *merger or consolidation.* . . . " [Italics added]

Section 3504 defines the powers, duties and liabilities of consolidated or merger corporations. Section 3505 provides for the vesting in consolidated or merger corporations of the rights, privileges, powers, franchises and property of the constituent corporations. Section 3506 preserves rights of creditors and liens upon the property of the constituent corporations, and provides that all debts, liabilities and duties "of each of the said former corporations shall thenceforth attach to the consolidated corporation." Section 3507 provides for proceedings in case any stockholder dissents from merger or consolidation. Section 3508 gives "such consolidated corporation" power to issue bonds or other obligations to an amount sufficient with its capital stock to provide for all payments which it will be required to make, or obligations it will be required to assume, in order to effect "such merger and consolidation," and to issue capital stock to such amount as is necessary, to the stockholders of the consolidated corporation in exchange or payment for their original shares.

Section 3502 clearly contemplates that the unification of two or more corporations under Alabama law may be either a merger in which no new corporation is formed, or a consolidation in which all the constituent companies end their existence and a new consolidated corporation is created. Sections 3503–3508 seem to provide the method of unification and to define the results thereof, regardless of whether such unification be a merger or a consolidation. So far as the statutes show, the Alabama legislature intended to leave to persons who wish to unify two or more corporations the choice as to whether or not a new corporation shall be formed; and then the legislature provided that irrespective of which choice was made, the mode of procedure and the results as to powers, disabilities, liabilities, rights of creditors and dissenting stockholders, etc. should be the same.

■ The agreement under which the Alabama Power Company and four other companies unified in 1913 sets forth with complete clarity the fact that those involved in the unification chose that no new corporation should be formed, but that the four other companies should be merged into the Alabama Power Company, which should preserve an unbroken identity.

The appellant urges, however, that the courts of Alabama have held that under the statutes in question a unification such as that under consideration results in the dissolution of all the constituent companies and the formation of a new corporation. In Jackson v. Ariton Banking Co., 214 Ala. 483, 108 So. 359, 45 A.L.R. .1026, 1926, the facts were as follows: In 1916 the Ariton Banking Company and the People's Bank of Ariton were corporations doing business in the same town. Each was capitalized at $25,000. The Ariton Banking Company stock had been paid for in full, while subscriptions for the People's Bank stock had been only 60% paid. In that year, in the language of the court, " . . . these two banks were consolidated, or, to use the language of the bill, the People's Bank was merged into the Ariton Banking Company." For the purposes of the consolidation or merger both banks were appraised, and in

the appraisal the stock of the People's Bank was treated as only 60% paid. In other words, the stockholders of the People's Bank were not given any interest in the merged or consolidated bank in exchange for the unpaid 40% on their shares. Shares of the consolidated bank were issued to the shareholders of the Ariton Banking Company and the People's Bank in full payment for their interests. In 1925 the Superintendent of Banks of Alabama filed a bill against the Ariton Banking Company and former stockholders of the People's Bank for the benefit of creditors owning obligations contracted by the Ariton Banking Company subsequent to the unification, that company being then insolvent. The trial court sustained a demurrer by the stockholders of the People's Bank. The Supreme Court of Alabama affirmed this ruling. The court held that since the unpaid subscriptions for People's Bank stock had not entered into the appraisal of assets in the unification, creditors whose rights arose subsequent to the same had no cause of action against the subscribers to People's Bank stock, since the consolidated or merger corporation had received full value for its stock. The court used the following language, upon which the appellant relies:

"The consolidated corporation comes into existence as a new corporation, the constituent corporations being dissolved, and the rights and liabilities of the new stockholders, except as limited and controlled by the statute, are determined by their relation to the new corporation. This, we think, is the effect of our statute, and this is the effect attributed to like statutes in other jurisdictions." [214 Ala. 483, at page 486, 108 So. 359, at page 361, 45 A.L.R. 1026]

In this part of the opinion the court was considering the proper construction of Section 3505 in the light of Section 3506, and was speaking of the rights and liabilities of stockholders in the unified corporation. We do not think that this case decides the problem before us. The sections of the statute under which it was decided apply with equal force to consolidated and merger corporations. Furthermore, if any corporation retained its identity through the unification it was the Ariton Banking Company. Under the Alabama statutes the People's Bank ended its existence whether the unification be treated as a consolidation or a merger, and therefore any rights against its shareholders must, under Section 3505,

have been asserted through the Ariton Banking Company whether it was a merger or a consolidated corporation.

The appellant also relies upon the following language from Alabama, T. & N. Ry. Co. v. Tolman, 200 Ala. 449, 452, 76 So. 381, 384, 1917:

"The consolidation of corporations, under statutes like ours, effects the dissolution of the original bodies, except for certain purposes specified, and the creation of a new one, which derives its rights and powers by virtue of the statutes of the state, and likewise its duties and liabilities; all such liabilities and powers being the same as those possessed by, or imposed upon, the former corporations.

" . . . While the merging corporations continue to exist for certain purposes, those purposes are limited by the statute."

But the following passage occurs in the opinion immediately prior to the language just quoted:

"While there is a technical difference between a merger and a consolidation of corporations, our statutes authorize and provide for both. A merger is the absorption of a thing of lesser importance, by a greater, whereby the lesser ceases to exist, but the greater is not thereby increased. A consolidation takes place when two or more corporations are extinguished, and by the same process a new one is created, taking over the assets and assuming the liabilities of those passing out of existence." [200 Ala. 449, at page 452, 76 So. 381, at page 384]

Far from being a determination that under the statutes of Alabama a unification is necessarily a consolidation, we think the dictum of the court, when quoted in full, indicates just the opposite. The Tolman Case was an appeal from an order appointing a receiver for a corporation which had been formed by the consolidation or merger of three other corporations. The plaintiff who brought the bill was "a creditor of two of the merging corporations; and his debt was secured by deeds of trust constituting a lien upon parts of the property and assets which went into the capital stock of the merger corporation. . . ." The court held that under Sections 3504–3508 of the Alabama Code the plaintiff had standing to bring the bill as a creditor of the merger corporation. Under the Alabama statutes he would have had the standing regardless of whether the unification were a merger or a consolidation, since

the controlling sections apply equally in both cases.

The appellant relies also upon the following language from Alabama City, G. & A. Ry. Co. v. Kyle, 202 Ala. 552, 555, 81 So. 54, 57, 1918:

"The new corporation thus formed possesses by virtue of law all of the powers, rights, and privileges of each and all of the old corporations consolidated or merged into the new, and has imposed on it by law all the duties, restrictions, and disabilities of the old, unless the powers possessed by the old are limited or restricted in the agreement of consolidation or merger. In addition to all the powers possessed by each and all of the old corporations; the new corporation may have conferred on it additional powers not inconsistent with any of the provisions contained in chapter 69 of the Code, if such additional powers are expressed in the agreement and acts of consolidation."

In that case the question was whether a certain railroad corporation had power to execute a contract and a note given as a payment thereunder. The suit was on the note and the defense was that it was *ultra vires*. The defendant corporation had been merged or consolidated under general laws, but several of its constituent corporations had been formed under special laws. The court held that the new corporation possessed all the powers of its constituent corporations, unless limited in the agreement or acts of consolidation, plus such additional powers as were therein expressed. The court then found express provision in the agreement of consolidation for power to act as a natural person and make contracts, and found that making the note was therefore within the power of the defendant corporation. The judgment against the railroad was reversed, however, upon the ground that the contract did not run to the plaintiff as obligee. We see in this case nothing conclusive of the question under discussion here.

We have considered all other Alabama cases cited by the appellant and have made independent search as to the Alabama law. We think that none of the cases discussed, and none found, can be said to hold that the Alabama law is that a unification necessarily results in the creation of a new corporation in the sense that no one of the constituent corporations may preserve its identity. So far as we have been able to discover the Alabama court has not been faced with the problem of whether a corporation, with which others are united under an agreement clearly indicating that the identity of the corporation is to be preserved, is or is not the same corporation in identity as it was before the unification. The language which we quote above from the Tolman Case indicates that a choice is given by the statutes.

The Alabama statutes are obviously designed to make this choice of as little importance as possible to creditors and dissenting stockholders of the constituent corporations. Indeed, so far as all things other than the identity of the merger or consolidated corporation are concerned, there seems to be no difference under Alabama law between a consolidation and a merger. The terms are used indiscriminately in almost all the cases which we have considered, since none of them was concerned with the problem of identity. As the court said in State v. Atlantic Coast Line R. Co., 202 Ala. 558, 560, 81 So. 60, 62, 1918:

"Accurate logicians very properly distinguish between the meanings of 'consolidation' and 'merger.' Strictly speaking, a consolidation means the unifying of two or more corporations into a *single new corporation,'* having the combined capital, franchises, and powers of all of its constituents. And, strictly speaking, a merger means the *absorption* of one corporation by another, which retains its name and corporate identity, with the added capital, franchises, and powers of the merged corporation. Alabama, T. & N. R. Co. v. Tolman, 200 Ala. 449, 76 So. 381; note 89 Am.St.Rep. 607; Noyes on Intercorporate Relations, §§ 7–11.

"For most purposes, however, and *apart from mere questions of identity,* the result is in each case practically the same; and so it is that courts and text-writers have usually used the terms 'consolidation' and 'merger' interchangeably, and, in cases of doubt, conjunctively, to express the idea of complete corporate union, whether a new corporation nominally results or whether a constituent corporation is nominally preserved." [Italics in second paragraph added.]

The appellant seems also to argue that the Supreme Court of the United States has held that the result of unification of corporations such as that which took place in 1913 is a new corporation, regardless of what the parties may stipulate in the agreement to unite. The company relies particularly upon Yazoo & Mississippi Valley Ry.

Co. v. Adams, 180 U.S. 1, 21 S.Ct. 240, 45 L. Ed. 395, 1901. There the Court said:

"While as stated in Tomlinson v. Branch, 15 Wall. 460 [21 L.Ed. 189], the presumption is that when two railroads are consolidated each of the united lines will be respectively held with the privileges and burdens originally attaching thereto, subsequent cases have settled the law that where two companies agree together to consolidate their stock, issue new certificates, take a new name, elect a new board of directors, and the constituent companies are to cease their functions, a new corporation is thereby formed subject to existing laws. But if, as was the case in Tomlinson v. Branch, one road loses its identity and is merged in another, the latter preserving its identity, and issuing new stock in favor of the stockholders of the former, it is not the creation of a new corporation but an enlargement of the old one. In such case it was held that where the company which had preserved its identity held as to its own property a perpetual exemption from taxation, it would not be extended to the property of the merged company without express words to that effect." [180 U.S. 1, at page 19, 21 S. Ct. 240, 45 L.Ed. 395]

In the Yazoo Case the court held that a unification had created a new corporation. The basis of the decision is summarized in the following language:

"*In view of the terms of the consolidating agreement, to which reference has already been made, and of the several acts of the Legislature of Mississippi authorizing these consolidations,* we are of opinion that a new corporation was contemplated, and that, taken together, these several documents should be read as if they had expressly provided, with legislative sanction, for the formation of a new association. Exemptions from taxation are not favored by law, and will not be sustained unless such clearly appears to have been the intent of the legislature." [180 U.S. 1, at page 22, 21 S.Ct. 240, 45 L.Ed. 395] [Italics added]

We have examined a number of other cases in the Supreme Court, among them Tomlinson v. Branch, 15 Wall. 460, 21 L.Ed. 189, 1873; Central Railroad & Banking Co. v. Georgia, 92 U.S. 665, 23 L.Ed. 757, 1875; Keokuk & Western R. Co. v. Missouri, 152 U.S. 301, 14 S.Ct. 592, 38 L.Ed. 450, 1894; Rochester Ry. Co. v. Rochester, 205 U.S. 236, 27 S.Ct. 469, 51 L.Ed. 784, 1907. These cases do not lay down the rule that when a sovereign provides that the effect of a unification may be a merger and the articles of agreement so stipulate, a new corporation is nevertheless formed. Instead, these cases indicate the rule to be that whether or not a new corporation is formed depends upon the legislative intent, as shown in the statutes which govern the effect of the unification, and upon the provisions in the articles of agreement, considered in the light of the statutes. See 5 Cook, Corporations, 8th Ed. 1923, § 897; 7 R.C.L. § 144. The statutes of Alabama clearly provide that the identity of the merger corporation may be preserved and the identity of the merging corporations merged in it. The persons in control of the Traction Company which brought about the 1913 unification chose with equal clarity that no new corporation should be formed. The choice is binding.

The appellant also argues that it "seems indefensible" that important substantive rights should depend upon "such a technicality" as whether or not a corporation retained its identity. This argument seems to us to have little weight under the facts of this case. The unification of 1913, it must be remembered, caused no change of control and was but the transmutation of several wholly owned subsidiaries into one. The first directors of the merger corporation were identical with the directors of Alabama Power Company prior to the merger, and the president was the same. All the stock of the "original" Alabama Power Company had been held by these directors and the Traction Company; all the stock issued by the merger corporation in exchange for the stock of all the merging corporations was issued to these directors and the Traction Company. And, although the trial court found that a new charter was had for the consolidated company, the charter was but an agreement rather than a formal corporate charter with recital of specific powers, etc.

We conclude that under Alabama law and the agreement of 1913, the Alabama Power Company which was formed in 1906 retained its identity in the merger of 1913, and is the licensee of the Mitchell Dam project.

We have detailed above the amounts which the Commission allowed as cost of lands involved in the Mitchell Dam project, and the method of computation. We have decided that no new corporation was formed in the unification of 1913. We therefore proceed to consider the correctness of the Commission's determination, in the light

of the fact that the Alabama Power Company organized in 1906 is the licensee.

■ As to the lands at the Lock 14 site, other than Parcel 214: Considerations recited in six deeds were stipulated to be the actual amount paid by the licensee. The allowance of these amounts as cost was obviously correct. In two deeds, however, as explained above, only nominal considerations were recited and the price paid was unknown and unascertainable. In view of the provision of the statutes for "actual legitimate cost" (16 U.S.C.A. § 797) and for "actual reasonable cost" (16 U.S.C.A. § 807), the Commission's allowance of what it considered to be fair market value at the time of purchase, computed upon comparison of the land involved in these two deeds with what had been paid for comparable tracts, was proper.

■ As to Parcel 214: The Commission admitted that this had been acquired in the merger and decided that the cost to the Power Company was the value of the land at the time of the merger. This it did upon the theory that when a corporation acquires assets in a merger in exchange for stock which it issues, the cost to it of the assets so acquired is their value at that time. This theory is based upon the further reasoning that the stock issued by the merger corporation represents in reality only the assets which it gets. We think the theory in valuing Parcel 214 was correct. In finding what the value of the parcel was at the time of the merger the Commission based its conclusions upon the last transfer of the land prior to the merger. This had been through the purchase in 1912 by the Traction Company of all the stock of the corporation which then owned Parcel 214. The payment which the Traction Company made was composed in part of securities. The Commission reckoned these at market value, which had been stipulated. The Power Company, in addition to its objection that its lump sum of $3,500,000 should have been allowed as the cost of all lands and water rights in the Mitchell Dam project, asserts that even if it be wrong as to this the Commission nevertheless erred in allowing only market value rather than face value of the bonds issued by the Traction Company when it acquired complete stock ownership of the corporation holding title to Parcel 214. The Power Company's contention in this regard is treated below.

■ As to Parcel 9, the lands at Duncan's Riffle, the actual site of Mitchell Dam:

Three-quarters of this land had been conveyed to the Power Company for known actual considerations. The allowance of these considerations was proper. The remaining one-quarter had been conveyed directly to the Power Company when the land was purchased by the Traction Company in 1912 and 1913. In this purchase the Traction Company paid part cash, part stock, and part bonds.. In computing the actual consideration paid, the Commission allowed only the market value of the stocks and bonds. As in the case of Parcel 214, the licensee contends that the Commission erred in failing to allow the face value of the bonds.

The Commission was correct in using the market value of bonds in computing the cost of this quarter of Parcel 9. The stipulation as to market value may be reasonably construed to mean that the Traction Company could have sold its bonds at the market and received cash in exchange. It could have thus acquired cash to pay for the one-quarter of Parcel 9. The figure found by the Commission thus represented the fair cash cost of one-quarter of Parcel 9. The fact that the Traction Company chose to issue bonds to the vendor rather than to sell the bonds to third persons and pay the vendor in cash does not alter this fact. Any cost incurred by the necessity of treating securities at a discount should be accounted for as cost of financing rather than as cost of lands.

For much the same reasons, the Commission's use of the market value of bonds in finding the value of Parcel 214 (which was the cost of that parcel to the licensee) was correct. The value of the land was computed at actual cash market value. We cannot say that the Commission was arbitrary in deciding that the cash price of land for which securities have been exchanged is not greater than the market value of the securities.

·The Power Company objects to the Commission's allowance of $76,135.09 as the actual reasonable cost of lands, and the disallowance of the $3,500,000 claimed by the Power Company as fixed capital not classified by prescribed accounts, not only upon the ground that the Commission erred in failing to recognize the creation of a new corporation in 1913, but also upon the grounds that the Commission has not included as part of the original cost of the project any allowance for large expenditures made for engineering, financing and

promotional services in the development of the Coosa River, for the increased value which each dam site acquired by the bringing of all hydro-electric development upon the Coosa River under common control, or for the value of water rights acquired under state law.

■ The Commission did not object to allowing as part of the cost of the project properly allocable expenditures made for engineering, financial or promotional services. Its failure to allow them was based solely upon the failure of the Power Company to introduce evidence definitive of the total amount of such expenditures and of the proportion allocable to the project. This failure of evidence is unfortunate, since it is only reasonable to suppose that a merger of this magnitude must have involved considerable investigation of the properties and much negotiation. The Power Company's inability to prove these costs is apparently explained by the fact that the merger was made long before there was any thought of the Federal Power Act and for the further reason that the Traction Company treated the hydro-electric development of the Coosa River as a unit, without any attempt to allocate costs to a particular project or a particular subsidiary.

In this situation, with some expenditures admittedly made, some portion of which must have been allocable to the Mitchell Dam project, but with a failure of proof as to the amount of the expenditures and of the proportion properly allocable, we cannot say the Commission acted arbitrarily in refusing to make any allowance. The Commission by its own practice allows reasonable estimated cost when actual cost is unascertainable and there are trustworthy grounds for an estimate. It made such estimates, as pointed out above, as to part of the lands at Lock 14. In the instant situation, however, the record shows no adequate basis for an estimate of the total allowable expenditures for engineering, financing and promotional services prior to 1913, and no basis for an allocation of part of them to the Mitchell Dam project. Upon the present state of the record any estimate as to this item would have been no more than a guess, and this the Commission was not required to make.

■ It is to be noted, however, that the licensee purported to include in its item of $3,500,000 *all* expenses connected with the Mitchell Dam project through the time of the merger. The Commission properly refused to allow the total amount and found the value of lands. But since we direct the trial court to return the case to the Commission for further hearing in regard to other items of cost referred to below it would be proper for the Commission to allow the licensee further opportunity to introduce evidence of cost of financing, engineering, and promotional services prior to 1913, included within the Power Company's claimed figure of $3,500,000.

■ As to the contention that the Commission failed to allow the added value which the lands acquired from the bringing of hydro-electric developments on the Coosa River under single control: In respect of lands owned by the Power Company before it became a subsidiary of the Traction Company, whatever added value they thereafter acquired through the bringing of Coosa River developments under common control cost the Power Company nothing. Since only the cost of lands is allowable under the Act, the added value, if any, was to this extent properly omitted from the original cost of the licensee in the project. In respect of lands which came into the ownership of the licensee after it had become a subsidiary of the Traction Company, we think that the Commission's figure included the added value attributable to unified control. There is ample evidence that the individuals and corporations owning these lands were well aware that their properties were valuable for hydro-electric purposes, and that they had made extensive efforts to develop their properties for themselves. The sellers, therefore, knew the value of the lands to any hydro-electric development, and their peculiar value to the Traction Company. The Commission so reasoned and refused to allow any increase in value derived from common control upon the ground that the considerations paid by the Traction Company for the land reflected this value. In this we think the Commission was right.

[15] The contention of the Power Company that its lands received an added value from the merger of 1913 is untenable. All the lands involved in the merger of 1913 were under the control of the Traction Company prior to the merger, and the value of lands already under common control cannot be increased by reducing from five to one the number of wholly owned subsidiaries holding title to the lands. In saying this we do not mean to imply that the lands here involved may not have

had an added value when in the control of a corporation which owned the other available dam sites up and down the river. Economical development of the river no doubt favored that all the sites be owned by a single organization, since it might well be that locations favorable for a hydro-electric plant would have to be sacrificed as reservoir lands in order to bring to highest usefulness other dam sites even more advantageously situated.

█ As to the value of water rights acquired under state law: The Federal Power Act requires that *price paid* for water rights be reported by the licensee, and the Commission is to determine the actual legitimate original cost. (16 U.S.C.A. § 797) If the Federal Government takes over the project upon expiration of the license, the amount which it is to pay is not to include any value for water rights in excess of the *actual reasonable cost* thereof at time of acquisition by the licensee. (16 U.S.C.A. § 807) Under these provisions the licensee was not entitled to an allowance of the value of the water rights but could be allowed only the cost to it of such rights. As said above, under Alabama law companies owning sites upon the Coosa River could, by filing plans for proposed developments, acquire without cost prior rights to develop the properties in accordance with the filed plans, and such rights were not subject to condemnation. Ala.Code (1907) §§ 3627 et seq., 6148–6150; cf. State v. Alabama Power Co., 176 Ala. 620, 58 So. 462, 1912. The companies which were unified in the merger of 1913 had filed such plans. To the extent that the water rights involved in the Mitchell Dam project had been acquired by the Power Company by filing plans, the rights cost the licensee nothing and the Commission properly allowed nothing. Parcel 214 at Lock 14, and Parcel 9 at Duncan's Riffle, however, were acquired by the licensee from a corporation and individuals interested in hydro-electric development. If any water rights attached to these parcels, the price paid for the acquisition of the land included the cost of the water rights to the licensee. The Commission's allowance of the cost of the land in Parcel 214 and Parcel 9, therefore, included the cost of the water rights if any.

We think, therefore, that the Commission has made full allowance for the water rights at Lock 14 and at Duncan's Riffle.

█ The Commission erred, however, in failing to consider the cost to the licensee of the water right owned by the Wetumpka Power Company at Lock 15, which was down-stream from Duncan's Riffle. No lands at Lock 15 are involved in the Mitchell Dam project and apparently the Commission for that reason failed to allow the cost of any water rights at Lock 15. The record shows, however, that the Wetumpka Power Company had the right under Alabama law to develop Lock 15 by a dam which would have impounded water to a height which would have flooded Duncan's Riffle, the present site of Mitchell Dam proper, to a depth of approximately 14 feet. The Mitchell Dam project therefore was erected in derogation of the water right of the Wetumpka Power Company at Lock 15, at least to this extent. The right of the Wetumpka Power Company passed to the licensee in the merger of 1913. The trial court should have directed the Commission to allow the introduction of evidence as to the cost to the Power Company in 1913 of the right of the Wetumpka Power Company to develop Lock 15 to an extent which would have made the Mitchell Dam project impossible, and to allow such cost as part of the original cost of the project.

## II

█ The Power Company claimed as an item of cost a fee of $183,540.15 paid to the Dixie Construction Company for building Mitchell Dam. The Commission disallowed this item upon the ground that the Dixie Construction Company was a department of the Alabama Power Company maintained during the construction of this and other of its public utility projects with a view to obtaining profits not otherwise allowable under the law. As to this item the trial court made the following findings:

"11. The fee of 3 per cent represented a profit to the construction company computed on the direct and overhead costs expended by it on the project. The direct costs incurred by the construction company were allowed by the Commission. The general administration expense of the construction company was disposed of by a stipulation with the plaintiff, dated December 7, 1931, and adopted by the Commission June 30, 1932, which allowed general administration expense of the construction company in the amount of $224,897.66.

"12. The plaintiff up until the time the construction company was organized had a construction department of its own which cared for its own construction activities and in addition did outside work for independent parties. The Commission found that plaintiff would not be entitled to a profit upon construction expenditures made in its own behalf, and the Dixie Construction Company was maintained by the plaintiff during the construction of project No. 82, and other of its public utility projects with a view to obtaining emoluments and profits not otherwise allowable, and under such circumstances the construction company was nothing more than a department of the plaintiff and the fee of 3 per cent profit on the construction expenditures was not a proper cost of the project.

\*     \*     \*

"20. There was substantial evidence before the Commission to support each of the Commission's findings of fact challenged by the plaintiff in this cause as arbitrary, contrary to the undisputed character of the evidence and wholly without support of any evidence."

The contract between the Dixie Construction Company and the Power Company for the construction of the Mitchell Dam project was upon a 3% cost-plus basis. It is not disputed that this percentage was reasonable, nor is it disputed that the Dixie Company did the work as efficiently and economically as any other construction company could have done it. The rejection of the fee by the Commission as a proper part of actual cost of the project must, therefore, rest entirely upon the proposition that the Dixie Company was nothing more than a department of the Power Company. The Federal Power Act contemplates that the figure involved in this proceeding shall be the actual legitimate original cost. It seems necessarily to follow, therefore, that if the 3% profit represented by the fee had been paid to a construction department of the licensee it could not have been included as a part of what the project cost the licensee. See Pullman Co., 36 I.C.C.(Val.) 845, 851, 1931.

Careful examination of the record discloses that there is substantial evidence to support the finding of the Commission and of the trial court that the Dixie Construction Company was a mere department of the licensee. In support of this conclusion the following facts may be mentioned: The Dixie Company and the Power Company entered into a blanket contract on January 30, 1919, which set forth the conditions under which the Dixie Company was to do such work as was designated by the Power Company from time to time. The specific contract for the construction of Mitchell Dam, a project with an estimated cost of almost $10,000,000, was a letter of a few lines. Among the items charged to the Dixie Company, apparently upon all work it was doing for the Power Company, were 95% of the expenses of the Power Company's land department; from 2% to 30% of the cost of the Power Company's safety department; from 35% to 50% of the charge of filing and general office expense of the Power Company; 75% of the time of the executive officers of the Power Company; and after the first two years of construction (apparently of the present project), 33⅓% of the cost of the Power Company's accounting department. The Power Company financed construction, and approximately 40% of the working force of the Dixie Company was drawn from Power Company employees. Part of the expenses of the filing, mailing and stationery department, the purchasing department, the general engineering department, and the New York office of the Power Company were charged to the Dixie Company. The Dixie Company also used Power Company engineers in the commercial department, Power Company executives for public relations, and Power Company lawyers on legal problems. The stock of the Dixie Company was wholly owned by the Power Company from the time of the incorporation of the Dixie Company until 1922, when ownership of the Dixie Company stock passed to the Winona Coal Company, a wholly owned subsidiary of the Traction Company. When the contract for the construction of Mitchell Dam was signed the officers of the Power Company and the Dixie Company were identical. All these facts taken together make it impossible for us to say that the conclusion reached by the Commission and the trial court, that the Dixie Construction Company was in fact a department of the Power Company, rather than a subsidiary working in close conjunction with its parent corporation, was unsupported by substantial evidence.

The Power Company contends, however, that although contracts between affiliated corporations are open to close scrutiny by regulatory bodies, and the

reasonableness of the contract payments must be proved, it is settled that the business of the utility is to be considered separate from that of its affiliated corporation, and that the affiliated corporation is entitled to a fair return for the services rendered. It relies upon Dayton Power & Light Co. v. Public Utilities Commission of Ohio, 292 U.S. 290, 54 S.Ct. 647, 78 L.Ed. 1267, 1934; Columbus Gas & Fuel Co. v. Public Utilities Commission of Ohio, 292 U.S. 398, 54 S.Ct. 763, 78 L.Ed. 1327, 91 A.L.R. 1403, 1934; Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 51 S.Ct. 65, 75 L.Ed. 255, 1930; Illinois Bell Telephone Co. v. Gilbert, 3 F.Supp. 595, D.C., N.D.Ill., 1933, reversed on other grounds *sub. nom.* Lindheimer v. Illinois Bell Telephone Co., 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182, 1934; Houston v. Southwestern Bell Telephone Co., 259 U.S. 318, 42 S.Ct. 486, 66 L.Ed. 961, 1922; United Fuel Gas Co. v. Railroad Commission of Kentucky, 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390, 1929. These cases may be said to establish the rule that in determining whether a rate required to be charged by a public utility is confiscatory its operating expenses may include reasonable charges paid to affiliated corporations for services rendered to the company whose rates are questioned. A typical example is found in the prices paid to the Western Electric Company by other affiliates, local telephone companies, of the American Telephone & Telegraph Company for materials sold to them by the Western Electric Company. In determining the fairness of rates charged by such local telephone companies their operating expenses may include the cost of purchases from the Western Electric Company although the prices charged by the Western Electric Company give it a profit upon the sale.

■ It is well settled, however, that the corporate entity may be disregarded when failure to do so would enable the corporate device to be used to circumvent a statute. Cf. United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458, 1911; Chicago, Milwaukee & St. Paul Ry. Co. v. Minneapolis Civic & Commerce Ass'n, 247 U.S. 490, 38 S.Ct. 553, 62 L.Ed. 1229, 1918; United States v. Reading Co., 253 U.S. 26, 40 S.Ct. 425, 64 L.Ed. 760, 1920. We think that this principle, rather than that relied upon by the licensee, is applicable here. We are not here considering whether rates charged by the Power Company are reasonable or whether the enforcement of any given rates would be confiscatory, but rather whether a figure asserted to be the actual cost to that company as a licensee under the Federal Power Act of constructing the Mitchell Dam project truly represents actual cost.

■ The statute in insisting upon actual legitimate cost must be taken to forbid inflation of cost by any device; and the finding that the Dixie Construction Company was a department of the licensee, since it is supported by substantial evidence, cannot be disturbed. If, as the Commission found, the Dixie Company was but the construction department of the Power Company, to allow a 3% fee on the costs of the "Dixie Company" would be to allow 3% more than the actual cost to the Power Company of the work. Our conclusion is that the disallowance of the Dixie fee was correct. Cf. Kansas City Southern Ry. Co., 75 I.C.C. 223, 233, 234, 1919.

### III

■ Concerning the Commission's refusal to allow taxes paid on project lands prior to the construction period:

The Federal Power Act provides that "the term cost shall include, insofar as applicable, the elements thereof prescribed in said classification [of investment in road and equipment of steam roads, issue of 1914, Interstate Commerce Commission], . . ." [41 Stat. 1063, § 3, as amended by 49 Stat. 838, § 201, 16 U.S.C.A. § 796 (13), Supp.1936]

The Interstate Commerce Commission classification thus referred to has an Account No. 75, "Taxes", which "shall include . . . all . . . taxes . . . levied and paid on property belonging to the carrier during construction and before the facilities are used for commercial operations, . . ."

The Power Commission's system of accounts includes Account No. 393 entitled "Taxes during Construction". This account provides for the allowance of taxes "levied and paid on property belonging to the licensee while such property is under construction, and before the plant is open for commercial operation".

Actual physical construction of the Mitchell Dam project began on August 1, 1921, and the project was placed in commercial operation August 15, 1923. The Power Company's initial cost statement

showed taxes actually paid on parcels of land included in the Mitchell Dam project from 1914 to the beginning of actual construction, amounting to $910.54.

The chief accountant of the Commission recommended that this. entire amount be disallowed. The Commission, however, held that some period prior to the start of actual construction was reasonably necessary for preliminary work, such as investigations, designs, the acquisition of necessary land, etc. It adopted three years as the extent of this prior period for the reason that preliminary investigations and other activities with reference to this project showed fair continuity after July 1, 1918, and also because a preliminary permit granted under Section 797(f) of Title 16, U.S.Code, is limited to three years. It therefore allowed such of the taxes as had been paid after July 1, 1918. This allowance amounted to $683.09. The remainder of the claimed taxes paid upon the project lands, that is those paid prior to July 1, 1918, were disallowed. These amounted to $227.45.

There is no dispute that taxes in the sum of $227.45 were actually paid by the licensee prior to July 1, 1918, or that such taxes were reasonable in amount. We are thus faced with the question whether taxes paid upon project lands prior to construction must be allowed as an item of cost. The Power Company contends that they must, because the Interstate Commerce Commission allows as costs taxes paid on property from the time of its acquisition until it goes into service. For this proposition the Power Company relies upon Kansas City Southern Ry. Co., supra, 75 I.C.C. 223, at page 231. There the Interstate Commerce Commission said:

"Account No. 75, taxes.—The bureau shows $9,785.62 in the investment cost as taxes paid during construction, whereas the carrier claims that it actually paid $167,-279.16, which accrued to November 1, 1897, and asks that this amount be included. As stated in our discussion of interest during construction, the property of the carrier was constructed by sections, some of which were opened for operations before November, 1897. The amount of taxes claimed by the carrier is the aggregate of taxes paid upon the different sections up to the time each section was put into operation. The investment cost should include taxes which accrued during the period prior to the beginning of operations and the valuations will be corrected accordingly."

In the language relied on, however, the Interstate. Commerce Commission was discussing taxes paid *during construction,* and there is nothing in this decision to indicate that taxes paid prior to construction are allowed by the Commission as an item of cost. Search of the Interstate Commerce Commission decisions has failed to disclose any ruling that taxes paid prior to the construction period .are ·reckoned as a part of cost.

The Power Commission in its brief concedes that: "It is the practice of the Interstate Commerce Commission in valuation cases under § 19a of the Interstate Commerce Act [49 U.S.C.A. § 19a] to permit the inclusion, as a part of the cost of land taxes paid thereon, from the date of the acquisition by the carrier until the date upon which the land is transferred to the primary road account for transportation purposes." No citation is given as supporting this concession other than the Kansas City Southern Railway Company decision referred to above. After having made the concession the Power Commission attempts to demonstrate that the Federal Power Act prohibits the allowance of taxes on land prior to construction, despite the asserted practice of the Interstate Commerce Commission.

Notwithstanding the concession of the Power Commission as to the practice of the Interstate Commerce Commission, we find, as above stated, no ruling of the Interstate Commerce Commission which indicates that taxes paid prior to the construction period are a part of cost, and we are bound to be guided by the rulings as we find them. The Interstate Commerce Commission system of accounts makes only one provision as to taxes and that, Account No. 75, includes only taxes during construction. The Account No. 2 of the Interstate Commerce Commission entitled "Land for Transportation Purposes" includes as one item of expense "Taxes accrued and assumed at time of purchase." Although the General Instructions indicate that listed items of expense are merely representative and do not exclude from the account analogous items omitted, we find nothing in the Land Account which would indicate that in it should be included taxes paid after acquisition and prior to the construction period. We therefore conclude that

the disallowance of taxes paid prior to July 1, 1918, was proper. In support of this conclusion it may be further noted that under 16 U.S.C.A. § 807, the price which is to be paid by the United States upon recapture of the project is not to include any value allowed for lands "in excess of the actual reasonable cost thereof *at the time of acquisition* by the licensee: . . . " The Power Company attempts to answer this provision of the statute with the argument that taxes should be allowed not as part of the value of the land but as part of the cost of withholding from productive use the funds invested in land. There is cogency to this argument, but since Congress has made the practice of the Interstate Commerce Commission the criterion by which the Power Commission must set up the accounts of licensees, we think that taxes paid prior to construction cannot be included as an item of cost.

In respect of the taxes allowed, we cannot say that the three-year period deemed necessary for preliminary work was arbitrarily short. We therefore think the trial court properly sustained the Commission's determination as to the amount of taxes.

### IV

Concerning the Commission's refusal to allow interest upon preconstruction expenditures:

The Interstate Commerce Commission's system of accounts, referred to above, in Account No. 76, "Interest During Construction", provides:

"When any bonds, notes, or other evidences of indebtedness are sold, or any interest-bearing debt is incurred for acquisition and construction of original road and equipment, extensions, additions, and betterments, the interest accruing on the part of the debt representing the cost of property chargeable to road and equipment accounts (less interest, if any, allowed by depositaries on unexpended balances) after such funds become available for use and before the receipt or the completion or coming into service of the property so acquired shall be charged to this account.

\*　　\*　　\*

"This account shall also include reasonable charges for interest, during the construction period before the property becomes available for service, on the carrier's own funds expended for construction purposes."

The Power Commission's system of accounts in its Account No. 394 has an almost exactly similar provision as follows:

"When any bonds, notes, or other evidences of indebtedness are sold, or any interest-bearing debt is incurred, for acquisition or construction of plant and equipment, the interest accruing on the part of the debt representing cost of property chargeable to fixed capital accounts (less interest, if any, allowed on unexpended balances) after such fund becomes available for use and before the receipt or the completion or coming into service of the property so acquired, shall be included in this account.

"This account shall also include reasonable charges for interest during the construction period on the licensee's own funds used temporarily during such period for construction purposes."

The Commission and the Power Company stipulated that the method of computing interest was satisfactory to both, and that the rate of 7¼ per cent per annum was satisfactory for application to the preconstruction period if it were finally determined that interest is allowable during that period on preconstruction expenditures. The Commission on final hearing decided that three years prior to the beginning of actual physical construction should be included as part of the construction period for the purpose of estimating interest. The reasons for the inclusion of this period and for the determination of its length have been set out above. The Commission refused to allow any interest for the period prior to three years before the beginning of actual construction.

The Power Company contends that interest should be computed over a period extending from the time funds were expended until the project was put into productive use. We find no authority in the Interstate Commerce Commission system of accounts for the allowance of interest over a period longer than that of construction. See Kansas City Southern Ry. Co., supra, 75 I.C.C. 223, at page 231; cf. Central Vermont Transportation Co., 114 I.C.C. 579, 1926. Indeed, this item is governed by much the same considerations as those discussed in connection with the disallowance of preconstruction taxes. There was no error in the Commission's refusal to allow interest accruing prior to the construction period as determined by it.

## V

■■ Concerning the Commission's refusal to allow more than out-of-pocket cost of electric energy supplied by the licensee for construction purposes:

The Power Company furnished a total of 6,132,175 kilowatt hours to the Mitchell Dam project for use in its construction. The cost of any additional plant, equipment, or other facilities especially required to be installed or employed for the purpose of furnishing this energy was allowed by the Commission as a proper part of the cost of construction of the project.

The parties stipulated:

"that the standard commercial rates which, during the period involved, the Licensee was required by the laws of Alabama to charge one of its customers for this class of power averaged 1.187 cents per k.w.h.; that the total cost to the Licensee of furnishing the above amount of power to said project, including proper proportionate allocations for taxes, depreciation, and interest on investment, as nearly as the same may practicably be determined, was an average of 1.187 cents per k.w.h., or a total of $72,788.92.

"It is further agreed that the increment cost of such energy so furnished by the Licensee (that is, the additional cost which Licensee incurred in preparing and standing ready to furnish the energy to be required in the construction of the project, and in furnishing such energy in the above amount over and above the total cost which Licensee would otherwise have sustained, and exclusive of any return on the investment used and useful in generating and delivering such energy) was, as nearly as may be practicably determined, an average of five mills per k.w.h., or a total of $30,660.88."

The Commission allowed only out-of-pocket cost, in the amount of $30,660.88.

The Power Company is entitled to some allowance for the cost of electric energy produced by it and used in the construction of the Mitchell Dam project. This cost may be likened to that of a railroad carrier for the transportation of men, materials, supplies and equipment over its own line for construction purposes. The Interstate Commerce Commission system of accounts clearly contemplates that such expense of transportation shall be included as a part of the cost of construction. This inclusion is specified in paragraph 4(e) of the General Instructions and in Account No. 43. The Power Commission contends, however, that only out-of-pocket cost may be allowed. The Commission relied upon the fact that the Interstate Commerce Commission's system of accounts includes "Expense to the carrier of transporting men and materials over its own line", and upon the latter Commission's practice of computing this allowance on a convenient figure per ton-mile. The Commission cites San Pedro, Los Angeles & Salt Lake Railroad Company, 75 I.C.C. 463, 485, 486, 1923. The Interstate Commerce Commission was there estimating the cost of reproduction new, and allowed a rate of 0.5 cents per ton-mile on the ground that its investigations showed that this rate "approximates closely the probable actual expense of the handling of this class of traffic." The carrier's attempt to justify a higher rate per ton-mile, which rate included consideration of maintenance, engineering, and all other expenses in connection with the movement of traffic, was rejected upon the ground that such overhead expenses were included in other accounts. We think that this decision cannot control the question before us. In the instant case it has been stipulated that the rate for which the Power Company contends includes *proper proportionate* allocations for taxes, depreciation and interest on investment. We think that this stipulation, fairly construed, means that the charge for the items of over-head named has not been included in any other account.

The sum which the Power Company contends should be allowed for energy furnished for construction purposes is figured at the commercial rate. The Power Company contends that under the laws of Alabama it was required to charge this rate to the Dixie Construction Company. As we have pointed out in our discussion of the fee of the Dixie Company, the Commission was entitled to look through the corporate entity, and the sum claimed by the Power Company cannot be justified upon the theory that the electricity was sold to an independent corporation.

We think, however, that the Commission erred in failing to allow more than the out-of-pocket cost of energy furnished for construction purposes. In a proceeding subsequent to that here involved the Commission has allowed for power furnished by a licensee for construction purposes a rate which included the cost of carrying the

licensee's investment in generating plants and line and which also included taxes, depreciation, operation and maintenance charges. Portland General Electric Company, H. R. Doc. No. 26, 74th Cong., 1st Sess., 1935, Federal Power Commission Report for 1934, 227, 241. The Commission here attempts to distinguish that decision upon the ground that here the parties have stipulated that the cost of additional plant equipment or other facilities especially required to be installed or employed for the purposes of furnishing energy to the Mitchell Dam project has been charged and allowed in other accounts as part of the cost of construction. · We do not think the distinction valid. The rate claimed by the Power Company does not include the cost of additional plant equipment or other facilities, so the fact that the cost of this item has been allowed cannot distinguish the Portland General Electric Company decision. The licensee should be allowed a charge which includes proper proportionate allocations for taxes, depreciation and maintenance. The stipulation asserts that the charge includes a proper allocation of "interest on investment". What this means is not clear. If it means that the charge which the Power Company claims includes a profit to it upon the power furnished, to that extent the charge should be reduced. If, however, no profit is included in the claimed charge, it should be allowed. In brief, the Power Company is entitled to its out-of-pocket cost in furnishing the power, plus proper proportionate allocations for taxes, depreciation, maintenance and interest charges upon its investment, but without the addition of any profit.

The Commission, in its report, indicated that to allow the amount claimed by the Power Company would result in duplicating the burden upon the public of the system overhead, since due allowance for the system overhead had already been made in fixing the rates chargeable to the public. This argument seems somewhat opposed to the stipulation that *proper proportionate*

allocations of overhead were included in the Power Company's charge. The allocations could hardly have been in proper proportion if they would result in duplication. Be that as it may, we think the argument is fallacious. The Commission was required to determine cost to the licensee, and that fairly includes total cost of energy supplied. Whatever basis the regulatory body of the State may in the future consider in fixing commercial rates for the licensee is immaterial. That body will then be fixing a nonconfiscatory rate for the Power Company, based upon its entire investment, and can then concern itself with duplications, if any. The Commission was here determining the cost to the Power Company of a particular project.

In summary: We hold that the trial court correctly sustained the Commission's allowances for land, taxes and interest, and its refusal to allow the fee of the Dixie Construction Company. But we hold further that the trial court should have directed the Commission to consider the cost of the water right at Lock 15 and to have required the Commission to allow not merely the out-of-pocket cost of electric energy but the total cost exclusive of profit, and therefore to have required the· Commission to determine whether or not the rate of 1.187 per k.w.h. included any element of profit. We further hold that since the case must be returned to the Commission in respect of the foregoing items, it would be proper for the Commission to allow the licensee further opportunity to introduce evidence of the cost of financing, engineering, and promotional services prior to 1913 included in the Power Company's claimed figure of $3,500,000.

We therefore reverse the decree of the trial court with orders to direct the Federal Power Commission to proceed in accordance with this opinion.

Reversed with directions.

VAN ORSDEL, Associate Justice, sat during the argument of this case, but died before the opinion was prepared.