ALABAMA POWER CO. v. FEDERAL POWER COMMISSION.

No. 10227.

Circuit Court of Appeals, Fifth Circuit.

March 11, 1943.

Rehearing Denied April 28, 1943.

William M. Maloney, P. W. Turner, and Walter Bouldin, all of Birmingham, Ala., for petitioner.

Charles V. Shannon and Richard J. Connor, Gen. Counsels, Wallace H. Walker, Atty., and Louis W. McKernan, Principal Atty., Federal Power Commission, all of Washington, D. C. (Jacob Goldberg, of Washington, D. C., of counsel), for respondent.

Before SIBLEY, HOLMES, and Mc-CORD, Circuit Judges.

SIBLEY, Circuit Judge.

Pursuant to Section 4(b) of the Federal Power Act, as amended, 16 U.S.C.A. § 797(b), the Federal Power Commission had hearings to determine the actual legitimate original cost of Alabama Power Company's Martin Dam project on the Tallapoosa River in Alabama, built under a license issued by the Commission on June 6, 1923, to Alabama Interstate Power Company (herein called Interstate) and transferred by the Commission's consent to Alabama Power Company (hereinafter called Alabama) on June 22, 1923. Alabama claimed a cost of about seventeen and a half million dollars. The Commission fixed the cost as of Dec. 31, 1929, at $15,-209,611. Of the difference of some two and a quarter million dollars a portion was ordered transferred to other capital investment accounts, but a large portion was ordered charged out of the surplus account, but later permitted to be charged out of a capital surplus reserve account. We are called upon to review these orders under Section 313(b) of the Federal Power Act, 16 U.S.C.A. § 825l(b). Numerous items of expenditure are asserted to have been improperly reduced or totally excluded from the cost of the project, and the requirement that any be wholly charged out of the assets of the Company is asserted to be unlawful. Under the last cited section of the Act, the findings of the Commission as to the facts, if supported by substantial evidence, are conclusive. The controversy is not over mere matters of bookkeeping, for the rights of Alabama may be affected in the future by the accounts established if federal rate regulation, the expropriation of excess profits, or the taking over of the project by the United States shall occur under the provisions of the license and the Federal Power Act.

As an aid to the Commission in its determination, Section 4(b) requires the licensee to file a statement "Showing the actual legitimate original cost of *construction* of such project * * * and of the *price* *paid* for water rights, rights-of-way, lands, or interest in lands." Section 14, 16 U.S.C. A. § 807, again refers to the value of lands as not "in excess of the actual reasonable cost thereof at the time of acquisition by the licensee." We take up first the exceptions relating to "price paid" for lands and interests in land, to-wit: the site of the dam; settlement with Russell of his power contract; Chapman homestead; and Kowaliga highway rights.

### Cost of Dam Site.

The dam site was acquired by Alabama from Interstate in connection with the assignment of the latter's license, the two companies having originally been strangers. What Alabama Power Company paid Interstate is not the point, for the project had already been undertaken by Interstate and defined by the license to Interstate. Interstate was the licensee. The assignment of the license to Alabama Power Company operated to place Alabama in the shoes of Interstate, to complete the project under the license in accordance with its terms. The price that Interstate had paid for the dam site and other land interests, as well as the construction costs expended by it go into the original cost account, but the price Alabama may have paid Interstate for them is immaterial, as the Commission rightly held.

Interstate was on Feb. 8, 1907, a corporation organized in Maine, with little more than qualifying shares of its authorized $1,000,000 common stock subscribed, and owning nothing. Washburn and Baker owned the stock of Muscle Shoals Hydroelectric Power Company, and an option to purchase for $150,000 the entire capital stock (par value $100,000) of Cherokee Power and Development Company, which then owned the site of Martin Dam and apparently nothing else. On that date they sold "the entire control and ownership of both the Muscle Shoals and Cherokee Company and the properties which they carry" to Interstate in exchange for its entire common stock, $1,000,000, which was on March 19, 1908, issued to Washburn and Baker, except three shares to three other men to qualify them to act as officers. It does not clearly appear just how or by whom the $150,000 due under the option for the Cherokee stock was paid, but it would seem that Interstate paid it by issuing its bonds a few days later; because $147,000 of the issue is stated to be a balance of purchase due three named persons for their

stock in Cherokee and for monies advanced by them to Cherokee, and $14,700 a balance due Washburn and Baker for another person's Cherokee stock. How this aggregate of $161,700 is to be reconciled with the $150,000 due under the option is not explained, but we presume the bonds were not accepted at par. The Commission's conclusion that Interstate invested only $150,000 of present value in the stock of Cherokee Company is supported by evidence. Cherokee Company (under a new name of Birmingham, Montgomery and Gulf Power Company) continued to hold legal title to the dam site until Jan. 11, 1912, when it made a conveyance to Interstate, for a recited consideration of $100 and other valuable considerations. We understand that there was no consideration, beyond the $100, except that Interstate already owned the Cherokee Company. If Alabama's view be taken that Interstate never purchased this land until it got this deed, then the purchase price would be only $100. The Commission's view is more reasonable that the substance of the matter ought to be regarded, and the price paid for the capital stock of Cherokee Company ought to measure the value of the site, for that gave the virtual ownership which was merely perfected by the deed. Accordingly $150,000 was fixed as the actual original cost to Interstate of the dam site.

Alabama complains that the Board did not accept as controlling the opinion value of $1,500,000 placed upon the dam site by its expert witness. This valuation rested mainly upon a comparison of the cost of producing power at this dam site, if developed, with the cost of producing the same amount of power by steam, making due allowance for differences in plant investments, and capitalizing the saving on a conservative basis to arrive at what a purchaser could afford to pay for the dam site. The Commission recognized that there was no technical market value for this property, and admitted this opinion in evidence and considered it, but did not regard it as a good criterion of value. It thought a better light was to be had from the price paid in 1908 for the Cherokee stock, which carried virtual ownership of the property and got its value wholly from the property. This is a permissible weighing of evidence in a fact finding of value. The price for this land having been paid in Interstate stocks, or bonds, for which no certain market value appears, unless in the value of

what they bought, and what they bought having its price fixed at $150,000 in money, it seems to us that the allowance of $150,000 as the cost of this land is supported by substantial evidence. If there were debts of the Cherokee Company involved which ought to be considered as deducted from the value of the Cherokee's property in pricing its stock, the amount and validity of them was not shown.

### Russell's Power Contract.

The Russell settlement grew out of the necessity to acquire a power development undertaken by Russell above the Martin Dam, which would be overflowed if Martin Dam were made as high as desired. Interstate in February, 1912, bought Russell out for a consideration of about $92,000 cash, and a contract that Interstate would for a period of twenty years furnish him and his factory power at agreed rates, on a somewhat complicated basis, and giving him the exclusive right to distribute power to Alexander City, the rates to be adjusted to any cheaper rates Interstate might make to any adjoining community. In August, 1914, a new contract was substituted, to run nineteen years and six months, for power on a simpler scale of prices, said to be Interstate's then standard rates, and with a 25% discount. Another modification was made in 1917. In 1921 the remaining term of the contract was cancelled for $53,342. The Commission allowed as part of the price paid, or reasonable cost, for the Russell lands the $92,000 paid in 1912, but refused to add to this the $53,342 paid in 1921 to settle the power contract, or the discounts on power bills between those dates. The discounts were not paid for land, but in pursuance of the terms of the power contract. The $53,342 was not paid for land, but to get rid of the power contract. The original power contract did enter into the agreement by which the land was acquired, but no proof was made of what sum, if any, it then represented in the price of the land. Russell was preparing to make power for his factory and for Alexander City. He would naturally wish, if he sold his power plant, to secure power as cheaply as he could have made it. On the other hand Interstate was about to go into the power business and would wish to secure a large customer for a long period, and might make a very cheap rate, close to cost. There was then no established power rate in that territory. They simply agreed on one.

The evidence thus does not show what amount of the price of the land, if any, is represented in that contract. Only the "cost at the time of acquisition by the licensee" can be allowed. Losses in the performance of the contract afterwards, or in securing release from it, do not constitute such original cost.

## Chapman Homestead.

■ The Chapman homestead, five acres, was bought by Alabama Power Company in 1925 in connection with a detached 401 acre farm which was to be flooded. The five acres were not in the flood area, nor in the final map of the project. Chapman refused to sell one tract without the other, and demanded $5,000 for the five acres. Alabama Power Company bought both, and later sold the five acres, which it did not need at all, for $50. The loss on the five acres is sought to be added to the price of the 401 acres, but the claim was rejected by the Commission. We think rightly so. The five acre tract was not necessary to the project and was never used in it. The 401 acre farm could have been separately condemned under Section 21 of the Act, 16 U.S.C.A. § 814. Buying the five acres probably saved the expense of condemnation, but neither the cost of the five acres nor the loss on its resale are legitimate actual cost of the project.

## Kowaliga Highway.

■ Kowaliga Creek, a tributary of Tallapoosa River above Martin Dam, was crossed by a highway on a short bridge. The dam would raise the water level about 100 feet, and cause the need of an expensive bridge over 3000 feet long. Section 3629 of the Code of Alabama of 1907 gave a right to acquire by condemnation "the right to flood public roads by paying to the court of county commissioners or board of revenue of counties in which public roads are, the cost of locating, laying out, and opening other public roads in lieu of and to the same extent as the public roads flooded." In lieu of a condemnation, and reconstruction of this part of the road by the County Commissioners, Alabama offered to construct it, but the Commissioners claimed that the bridge would cost on an average $3,500 per year to maintain, and they would agree on no settlement unless Alabama agreed to maintain the bridge. Alabama offered to pay $70,000 additional to cover this claim, and that offer was accepted and the money was paid. The Power Commission allowed the cost of road and bridge building, but disallowed the $70,000 as being properly an "expense of maintenance item", to be distributed as such over the period of the license. We think this is not a legal disposition of this item. The bridge when built, whether by or for the County, was a county bridge. The legal duty of maintaining it was on the County, and Alabama refused to make any contract to maintain it. It has not and never had any duty to maintain it. It was seeking to acquire the right to flood that road, and all it paid was, from Alabama's standpoint, the price of that right. It does not alter the case that from the County Commissioners' standpoint the $70,000 was to be used by them for maintenance. We are of opinion that the item is a part of the original cost of the project.

## Taxes and Interest.

■ Turning to construction costs, those expended by Interstate (except taxes prior to July 1, 1922) were allowed and are not in dispute. Property taxes during construction, and for a year preceding commencement of work, were allowed as part of the cost of the project, pursuant to the system of accounting of the Commission put out in 1922. It is contended that taxes for the time before that, during which Interstate owned and was holding the lands, ought to be added. Taxes are the annual compensation paid to government for annual protection and for the current support of government, and are generally an expense and not an investment. Only from the date that property included in a project is definitely committed to it and cannot be otherwise used, are taxes fairly a cost of the project under construction. They are certainly not a part of the original price paid for the land. No principle of law requires a more generous allowance of taxes than was made.

■ Most of the construction was done by Alabama, or by Dixie Construction Company for it, after the assignment of the license. Construction was not entirely complete until December 31, 1926, although the time allowed by the license expired September 1, 1926, and was not extended by the Commission. Section 13 of the Act, 16 U.S.C.A. § 806, requires due diligence in the prosecution of the construction and completion within the time fixed in the license, and provides for an extension of the time by the Commission; but the only remedy it provides for fail-

ure, if construction has begun, is subjection to a proceeding in equity for revocation of the license and sale of the work. This remedy was not invoked. Delay in completion thus condoned will not result in elimination of any actual investment in the work because of tardiness. But unexcused delay may cause interest or tax allowance during it to cease to be a legitimate cost. The Commission found that notwithstanding loss of time from floods and because of raising the height of the dam, due diligence, as well as the time limit in the license, required completion of the work by Sept. 1, 1926, and that substantial amounts of power were in fact generated beginning August 29th, though all units were not in operation and cleanup work was not completed till December 31st. Interest on the amount invested as a part of construction cost was stopped September 1, instead of on December 31. We cannot say this is unlawful. Interest, like taxes, is ordinarily an expense rather than an investment. The allowance of it as a cost of construction has limits, and involves a discretion which we do not think has been unlawfully used.

■ The rate of interest allowed was 6% instead of 8% which was in 1924 and 1925 the legal rate in Alabama. Alabama Power Company borrowed no money for this project, so interest paid does not enter as a cost item. The Commission's system of accounts provides in such a case that "reasonable charges for interest" may be allowed. This does not necessarily mean the legal rate in a State. Under the facts proven we cannot say that the 6% allowed was not reasonable. While Alabama presented testimony that for the years in question it was paying more, its general auditor testified that its rate on preferred stocks and bonds during the period from 1920 to 1929 was 6.1 per cent. This is substantially the rate fixed by the Commission. Alabama and the County Commissioners figured on 5% in dealing about the maintenance of Kowaliga Bridge.

### Dixie's Construction Fee.

■ Alabama constructed this and many other projects under a general contract with Dixie Construction Company to pay cost plus 3 percent. The Commission disallowed the 3 percent as not being legitimate cost because of the close affiliation of the two companies. The two had separate offices, officers and employees, but

Alabama owned all the stock of Dixie until Jan. 1, 1922. The entire stock was transferred then to Winona Coal Company, which was wholly owned by the holding company that owned Alabama. In 1924 Southeastern Power and Light Company acquired them all. For the period from August, 1921, to August, 1923, Dixie was held to be the construction department of Alabama, as respected another project, and that the 3 percent fee was to be regarded as an intercorporate profit and not a cost of construction. Alabama Power Co. v. McNinch, 68 App.D.C. 132, 94 F.2d 601. We think the same is true in this case. The purpose of the determination of original legitimate cost is to protect the public against exaggerated claims by licensee utility companies of their investments in respect of which they are entitled to a return. Holding companies have much confused the matter. This is a situation in which the corporate fiction may be carefully scanned and separate corporate entities ignored when they are used to evade the law. So long as Alabama owned Dixie, there was no strain in holding it a mere department of Alabama. The matter is not much changed by the shift of stock ownership so that the same corporation owns them both. Legitimate costs cannot in either case be swelled beyond what they would have been if the construction had been done by the ultimate owner of the project. Legitimate cost includes everything spent that would have been rightly spent if there had been but one corporation, but not profits charged by one wholly owned corporation against another. See authorities cited in the McNinch case 68 App.D.C. at page 132, 94 F.2d at page 618.

### Dixie's Overhead.

The general overhead expenses of Dixie, not chargeable to any particular project it was constructing at the time, were prorated among them all by the Commission and the prorata part for this project allowed. Certain items were excluded from the proration, to which exception is taken.

■ 1. Engineering expenses for studies of the general plan and costs of Alabama's power system were excluded, and directed charged to operating expense of Alabama. These looked to the long range development of the whole power system, and seem to us, if of permanent value to the system, to be a proper capital item for the system as a whole; but

they are no part of the construction cost of this particular project. According to the definition of "project" in the Power Act, Sect. 3(11), 16 U.S.C.A. § 796(11), the project stops at the point of junction of its transmission line with the general distribution system. We uphold the exclusion of this item from the cost of this project, but make no judgment as to its proper inclusion in any system account.

2. Travelling expenses of Dixie's general engineer Thurlow and an assistant James were allocated to this project when identified as incidental to a trip for it, but because the witnesses could not remember just what other trips were for the expense for them was wholly disallowed. The salaries of these men were prorated as overhead, because they were working on many projects at once. It appears that their trips often concerned several projects at the same time; often a trip was a circuit of several places. All concerned construction work. Itemized vouchers were made at the time, and charged as general overhead, but with no effort to identify particular projects served. There is no doubt the money was all spent for construction in the line of duty of these men. It was of course impossible for them to remember sixteen years later the purposes of each trip. We think the expenses, like the salaries, are properly proratable overhead, and the difference attempted to be drawn is arbitrary. The expenses ought to be prorated like the salaries.

3. Expenses of offices maintained by Dixie in New York, Delaware, Georgia and South Carolina were excluded from overhead, this project being served by the Birmingham, Alabama, office which we understand was the main office. It does not appear how the branch offices were of any service to this project. The Commission was justified in refusing to consider the cost of their maintenance to be a cost of this project.

4. The expense of maintaining membership in an association which kept a watch on legislation is not a cost of construction in any sense. Even if it was not for an unlawful lobby, it was certainly not includable in this cost account against the public.

5. So the cost of service emblems for employees to wear was rightly rejected as a construction item.

### Bonuses to Employees.

We are of opinion that bonuses regularly paid to employees in general at the end of the year are, though voluntary, in aim and effect additional wages, and ought to be allowed as such. These were not bonuses paid to the officials, such as sometimes are paid to reduce apparent profits for income tax reasons, nor were they windfall gratuities, but were paid each year for seven or eight years, and were expected by the workers. Such a bonus policy is often considered good business as tending to satisfy employees with their wages, and as an incentive to greater effort. For tax purposes they are earned income of, and not gifts to the employees. Bass v. Hawley, 5 Cir., 62 F.2d 721. These were paid for labor, and not from philanthropy, and ought to be included with the wages they supplemented, as construction costs. We except from this ruling a payment of $90 to Sigmund Nesselroth, an architect, which seems to have been a mere Christmas gift.

The extra pay at the end of the job paid to certain key men is testified without contradiction to have been promised them by the construction manager two years before the construction ended. This pay was not voluntary, but paid under promise, and was wages and not bonus. It ought to be allowed.

### Alabama's Overhead.

The commission allowed a portion of Alabama's overhead, but not so much as was claimed, nor so much as was allowed in the Mitchell Dam project. It explains that Dixie was not so well organized at first and its construction work required more attention from Alabama's men than later when Martin Dam was built. What, if anything, Alabama's general establishment contributed to this project is a question of fact. We will not disturb the Commission's decision of it.

### Equipment Rental.

Dixie charged a rental for equipment used on this project, instead of depreciation, repairs, and other expense relating to it. The Commission, insisting that the rental might include a profit, heard testimony as to the cost of the equipment, its depreciation, salvage value, insurance, interest, and the like, and allowed a less sum than was claimed as rental. Because of the common ownership of Dixie and Alabama, the Commission was justified in

enquiring into the true cost of using the equipment in this project, and the amount it allowed is supported by evidence and is sustained.

### Accounting Entries.

The Commission, after eliminating many items of expenditure from the cost of Martin Dam project, ordered some transferred to other project or invested capital accounts. No contest is made of these. Other items of a large aggregate were ordered charged out of the surplus account. Alabama in a motion for rehearing denied the Commission's authority over its general accounts, and contended that on a hearing to determine original cost of a project only the cost of the project could be dealt with. The Commission then stayed its order as to entries on general accounts, and ordered that Alabama show cause in writing why the entries should not be made, and submit such accounting treatment of disallowed items as Alabama might propose. In response Alabama presented at length its contentions that the Commission had given no hearing about the general accounts, had no control over them, and that its assets could not be ordered written out of them because not included in the cost of this project; and it proposed that in lieu of the order to write the items out of surplus, they be allowed charged to an account of capital surplus created by reducing the capital stock in a refinancing which was underway. On the authority of Northern States Power Co. v. Federal Power Commission, 7 Cir., 118 F.2d 141, (reinforced now by Alabama Power Co. v. Federal Power Commission, 75 U.S.App. D.C. 315, 128 F.2d 280) the Commission denied all contentions, but permitted the charge off to be made from the capital surplus reserve account.

■■ We have no familiarity with the Commission's system of accounts prescribed for licensees, nor with the accounts required of public utility companies by the State of Alabama. We know that the Alabama Code gives to the Alabama Public Service Commission authority to establish a uniform system of accounts. The Federal Power Act, § 301(a), 16 U.S.C.A. § 825(a), likewise gives the Federal Commission broad power to prescribe accounts and a system of accounts for licensees, and to prescribe, after notice and opportunity for hearing in what accounts particular outlays shall be entered. But there is a proviso that the public utility is not to be relieved from keeping any accounts or records required by the authority of any State. The Alabama Company has many power properties not licensed by the United States, and these and the licensed projects are integrated into a great power system. It may be that the State scheme of accounts is not the same as the accounts required by the Commission to be kept for the purposes of the federal Act. It may be that the Alabama Company for the information of its stockholders and the commercial public as well as for its own business convenience needs still other accounts and records. We think the Commission has not authority to order entries upon any of these accounts except those which it requires kept for the purposes of the federal Act. But we do not understand that it has undertaken to do so. The surplus account and capital surplus accounts must refer to accounts which it has authorized and supervises. Having determined that certain items are not legitimate cost of Martin Dam project, it follows of course that they must be written out of that project account, and of necessity dealt with in some other account. The hearing upon their excision from the project is almost of necessity one to ascertain the true character of the items and the proper charges elsewhere. And the suspension of the accounting order and the requirement to suggest another disposition afforded a further opportunity to be heard. The alternative disposition suggested by Alabama was in fact adopted. Procedural requirements were met.

■■ We do not think any property right has been taken without due process of law by the charge out. There may be, as is contended, some investment of permanent worth which legitimately increases the present value of Alabama's properties used and to be used for the public benefit on which a return is due in rates, but which is not part of the legitimate original cost of Martin Dam under the license and the federal Act which it embodies. The Commission's accounts do not at all affect the State rates. If in the future federal rates are fixed it will be time enough to decide what effect the Commission's accounting orders are to have. See Sections 20, 205, 206, 208, 16 U.S.C.A. §§ 813, 824d, 824e, and 824g. We find no provision in the Act making them conclusive. It is otherwise as to the order fixing the legitimate original cost of a project under

Section 4(b). The power there exercised is to "determine" the ·cost, and the result is to be filed with the Secretary of the Treasury. After judicial review here there is added the force of a judicial determination. The "net investment" in the project is ascertained at any given time from this original cost as a basis, under section 3(13), and is important both in fixing rates under Section 20, and in taking over a project under Section 14. But the mere bookkeeping which the Commission may order under Section 301 we think is informational. We are impressed that with two exceptions the items required to be charged out are in truth mere expense, and not capital items, but there is nothing to prevent the Alabama Company from treating them as really in suspense, and capable of assertion as representing an investment (not however as a part of the cost of Martin Dam project) if hereafter it is important to do this. We therefore uphold the accounting orders as applied to the Commission's accounts. We do not adjudge that all that has been ordered charged off is forever lost to Alabama. We rule simply that the Commission has the power to have its accounts kept as it prescribes.

The Commission is directed to add to the cost of Martin Dam project the items which we have held to be wrongly excluded, with corresponding changes in the accounting entries, and with this modification the orders under review are affirmed.