## ALABAMA POWER CO. v. FEDERAL POWER COMMISSION.

### No. 10262.

Circuit Court of Appeals, Fifth Circuit.

July 8, 1943.

Rehearing Denied Aug. 6, 1943.

P. W. Turner, Walter Bouldin, and William M. Moloney, all of Birmingham, Ala., for petitioner.

Charles V. Shannon, General Counsel, Wallace H. Walker, Asst. Gen. Counsel, Louis W. McKernan, and Stanley M. Morley, Attys., Federal Power Commission, all of Washington, D. C., for respondent.

Before HUTCHESON, HOLMES, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

This petition seeks a review of orders of the Commission determining the actual legitimate original cost of petitioner's Jordan Dam project on the Coosa River, the last of three hydro-electric projects which petitioner constructed and now operates pursuant to licenses obtained from the Federal Power Commission. The Commission's determination of the cost of the first project, the Mitchell Dam on the Coosa River, was reviewed and in substance affirmed in Alabama Power Co. v. McNinch, 68 App.D.C., 132, 94 F.2d 601, and Alabama Power Co. v. Federal Power Commission, App.D.C., 128 F.2d 280. Its determination of the cost of petitioner's second project, Martin Dam on the Tallapoosa River, was reviewed and in substance affirmed by this court in Alabama Power Co. v. Federal Power Commission, 5 Cir., 134 F.2d 602. Because in those three cases, the principles governing review in cases of this kind were fully canvassed and applied, we will not further elaborate them here. Many, indeed most, of the precise questions at issue here were considered and decided there, and because they were, our labors have been greatly lightened and our opinion greatly shortened.

Petitioner concedes that this court has in the Martin Dam case disposed adversely to its claim of most of the matters complained of here.[1] But, insisting that they were incorrectly decided, it elaborately reargues and urges us to reconsider all of them.

The Commission on its part insists that upon the principles of res judicata and stare decisis, the matters determined in the Mitchell and Martin Dam cases may not be reconsidered and differently decided here and that the other matters complained of were correctly decided by it.

We need not undertake to determine whether the questions decided in those cases could be differently decided here, for we are not in any doubt that they ought not to be. We shall, therefore, make the same disposition of them as was done in those cases, confining our investigation and decision anew to those matters presented here for review which were not presented and determined in the earlier cases. This conclusion disposes in petitioner's favor, because disposed of favorably to it in the Martin Dam case, its claims that bonuses paid as additional compensation, claimed under Items I and X, and certain traveling expenses, claimed under Item I, were erroneously disallowed by the Commission. It disposes adversely to petitioner, because they were disposed of adversely to it in either the Jordan or Martin Dam cases, or in both, of all of the other sub-items under Item I and of Items II, III, V, VIII, XII and

---

[1] These are as numbered and presented in Petitioner's brief:

Item I: General Administration and Overhead of Dixie Construction Co. $194,440.75;

Item II: Fee of Dixie Construction Co. $253,743.72;

Item III: General Administration Expense—Alabama Power Co. $245,036.54;

Item V: Interest $755,610.69;

Item VII: Commission to Dean for land purchase from State—$5000.00;

Item VIII: Taxes $5,372.25;

Item IX: The rejection of $123,259.97 credit allowed by Petitioner for energy generated by the project during construction and the excessive charge in lieu thereof of $329,693.52;

Item X: Bonus of One Month's Pay $6,460.00;

Item XII: Charges for General Construction Equipment $251,360.03;

Item XIII: Non-project lands. Disallowance of costs of land lying outside the project boundaries established after the completion of project, $12,450.00; $1,472.31; $53,230.75;

Item XIV: Lands acquired in 1913 Merger $2,750,000.00;

Item XV: Lands purchased from the State of Alabama $130,377.48.

XIV.   It leaves for consideration and determination by us Items VII—Commission Paid Dean; IX—Credit for Electric Energy Generated during Construction; XIII—Cost of Non-Project Lands; and XV—Costs of Lands Purchased from the State.

■   Items VII and XV relate to the same transaction, the purchase of land from the State. Their determination rests upon the same inquiry, whether the amount paid the State was the actual legitimate cost thereof in the sense of being its reasonable value. The Commission, fixing the actual legitimate cost of the land not at $1,000 per acre, the price actually paid the State for it, but at $125 an acre, and determining that the purchase price was, therefore, excessive and unreasonable, disallowed as legitimate actual cost all of the excess over $125 per acre paid for it. A careful study of the record convinces us that there is not only sufficient, but overwhelming, support for the finding that viewed as land wholly apart from the State as owner of it, the price paid did not represent the reasonable value of the land but in fact was grossly in excess of it. In negotiating with the Governor of the State, petitioner's president took the position that the company ought to pay its value simply as land and that that was not above $50 an acre, while the Governor took the position that he didn't care what the land was worth as land, the state would not sell it for less than $1,000 an acre. That was the price, and the company could take it or leave it at that. The hundreds of acres of the same kind and character which were acquired for this project had been acquired at an average cost of $40 an acre. Powell, manager of the Land Department, testified that he thought the State's whole tract of 600 acres with the improvements on it would, as improved, be reasonably worth $125 an acre, and the Commission allowed for the unimproved 106 acres, which was all that was taken, the value per acre set for the whole improved place. Petitioner here does not really dispute these conclusions. It takes the position that the statute, in fixing the actual legitimate cost as the matter to be arrived at, compels the Commission to allow what was actually paid in the absence of evidence showing fraud, collusion, or mismanagement. It stands upon the undisputed fact that all of the negotiations were in good faith and that it was the deliberate and considered judgment of the management that it was better to pay the $1,000 demanded by the State than not to get the land which was necessary for the project or to engage in a condemnation struggle with the State, complicated as it would be both by questions of its right to condemn land of the State and of the disadvantages it would be at in such a proceeding. Two of the commissioners agreed with the petitioner's contention, and though we agree with the majority that the price paid is so grossly excessive as that it cannot be allowed as claimed, we are not prepared to hold that if the petitioner could have, and had, resorted to condemnation, it would not have been required, at least for the 106 acres taken from the 600 acres regarded and held by the State as a potential power site, to pay considerably more than the $125 the Commission has allowed. We hold that the evidence supports the Commission's findings that the $1,000 per acre paid the State for the land was excessive and unreasonable and not, within the statute, the actual legitimate cost of the project, but not its finding that $125 per acre was. We remand the matter for a redetermination of the actual legitimate cost in the light not merely of its value as agricultural land, but of what, since the evidence is undisputed that petitioner could not have gotten it without condemnation for less than the price paid, it might have been compelled to pay for the land in condemnation, taking into consideration all the elements of value properly to be considered in such a proceeding.

■   Having found that the price paid for the land was excessive and unreasonable, it follows that the Board's disallowance of the commission paid Dean to negotiate the purchase should be sustained. The evidence as to Dean's employment comes from Powell, manager of the Land Department. He testifies that he asked Dean to help him buy the land, promising a 5 percent commission if he would obtain the 600 acre farm for a reasonable price, Powell telling him that in view of the improvements on the land he thought $75,000, or $125 per acre, would be a reasonable price for the entire 600 acres. In view of the testimony, we think it plain that it cannot be claimed that Dean earned his commission, for the evidence shows that Dean did not obtain the land

at a reasonable price. The Governor merely fixed an arbitrary price on the land of $1,000 an acre, and the company had to pay that price or leave it.

■ Item IX deals with credit to the cost of the project to be allowed for electric energy, 85,018,000 KWH, generated during construction and delivered to petitioners operating system "where it was intermingled with other electric energy and became a part of the total energy" sold at that time. The receipts from the sale of this energy amounted to $514,-664.96, or 6 mills per KWH. From these receipts, according to the formula proposed by the commissioner's staff accountants, $10,378.48 should be deducted as the cost of generating the power, and the net balance, $504,286.48, should be credited to the project. It is petitioner's contention that the credit should not exceed the value of the energy at the generating plant determined by what the same energy would have cost from the next cheapest source of supply available at the time. Under this theory, petitioner contended that 18,978,000 KWH could have been obtained from the excess storage at Martin Dam at no additional cost, that 64,-630,000 KWH could have been obtained from Wilson Dam at a cost of 2 mills, and that 1,410,000 KWH could have been obtained from the Gorgas Steam Plant at 3 mills, making a total, after deducting $10,378.43, cost of operating the project, to be credited to the project of $123,259.97. As to this item, petitioner argues with emphasis and conviction that instead of finding, as it was required to do, the actual value at the generating plant of the energy sold by the plant during construction, as above, the Commission, by the pretended but not real use of a formula having no correct relation to the problem dealt with and requiring a credit against project cost of $504,286.48, has arbitrarily set a value on the energy of $340,072.00 or 4 mills per KWH, and a consequent credit against the cost of the project after deducting $10,378.43 generating expenses of $329,-693.52.

As to the formula, petitioner claims that its use by charging the project with the entire amount received for the energy less only the generating costs operates confiscatorily by including in the value of the energy credited to the project large elements of value derived from the use of petitioner's unlicensed transmission, distribution and other facilities wholly disconnected from this particular project. Says the petitioner: "The gross electric receipts represent the value of the energy as delivered to the ultimate consumer. It does not represent the value of the energy at the generating plant which is the fact to be determined. As there is deducted from the gross receipts only certain costs, the remainder from which the average value is derived includes the fair return upon petitioner's unlicensed transmission, distribution and other facilities and thus the value at the generating station as finally derived is inflated by the amount of the return which was derived from the unlicensed facilities. The result is that the fair return to which the licensee is entitled is confiscated by reducing the net investment of this petitioner in this project by a proportion of such returns. The fundamental fallacy of this formula which makes it legally absurd is this: *The formula applies the fair return received by petitioner on its unlicensed, transmission and distribution property to reduce the cost of this licensed project.* Stated in another way, the formula, attributes all the profit derived from petitioner's entire electric business to the generating plants and attributes none to any of the other properties of petitioner, such as its transmission, distribution and other physical properties, and working capital."

In addition to this attack upon the formula, the petitioner points out what it claims are numerous other errors in it. In further support of its claim that the Commission has arbitrarily arrived at the cost to be credited, petitioner asserts that in the case of the Mitchell Dam project, where petitioner was endeavoring to have the value of the power added to the cost instead of, as here, subtracted from it, the Commission found as the value of the generated energy to be added two mills as against four mills here when the values are to be subtracted.

We are not prepared to affirm with the easy confidence exhibited by the majority of the Commission that we fully understand the formula and its application, both because the Commission does not undertake to explain it, contenting itself with saying, "The record disclosed the formula for making such determination which was fully set forth and explained by the staff accountant at the hearing", and because

the Commission in finding the value has completely departed from the formula and used a sort of catch as catch can theory of having one hand wash the other. We are prepared, though to say that if the formula is a sound one and applicable for the settlement of the controversy, as the Commission's words affirm, its acts deny, it should be so applied and not be abandoned for an entirely different theory, while, if it is not a sound one, it has no place in the determination of the issue presented. While not prepared then to hold, in the present state of the record, that petitioner's theory of solution is a correct one, we are in no doubt that the Commission's disposition of the item is erroneous, that it amounts to no more than guessing off a substantial item of value, and that its finding in respect to it must be reversed and the matter referred back to the Commission for the proper determination of the credit to be allowed.

■ Finally, there is Item XIII—Loss on purchases of lands lying outside of the project boundaries as those boundaries were determined after its completion. This loss is made up of three items, (1) $12,450, cost of five parcels of land, (2) $1,472.31, acquisition expenses in connection with these lands, and (3) land purchased from petitioner's affiliates at a cost of $53,230.75. The Commission disallowed the costs of Items (1) and (2) as for lands lying wholly outside the project boundaries on the ground that "Licensee failed to show that it was necessary to acquire such lands for the construction of this project". As to Item (3), it found that petitioner did not sustain the burden of showing the cost to its affiliate of the properties purchased. Petitioner does not dispute the Commission's position that Items (1) and (2) would not be allowable if the lands had not been reasonably acquired for use for project purposes, nor does it dispute the Commission's position that the cost to affiliate of lands purchased from it must be shown. It insists that all of the lands were purchased for project uses, that most of the lands purchased from its affiliate lie within the project boundaries and that the failure of the record to fully show these facts was due to its justified assumption, as the issues were drawn, based upon the uniform practice of the Commission, that the costs of these lands would not be disallowed as nonproject lands, that it was not being claimed that the cost to petitioner was not the same as the cost to the affiliate. It insists that the first inkling it had that any of the matters under this head were proposed for disallowance was in the brief filed by the counsel for the Commission after the hearing. It asserts, too, that in its brief, it called to the attention of the Commission that these issues raised by brief of counsel for the Commission did not exist, and that it also pointed out in its brief that the land acquired from the affiliate had been transferred to petitioner at the cost to the affiliate, and that at least some of the lands lying wholly without the project boundaries had been purchased for project purposes. It insists, therefore, that it has not had a hearing on these items and asks that such a hearing be afforded. The Commission in its brief makes no effective answer to this complaint in substance that the finding was not within the issues made, and it has therefore been based upon technicality and not upon substance. A proceeding of this kind is substantial and not technical. Its purpose is to ascertain the actual legitimate cost of the project under consideration. We think it clear that as to this item there is enough doubt as to whether the matter has been fairly heard and determined on its merits and substantial justice has been done as to it to require our disapproval of the highly technical findings as to it and a remand of this item to the Commission for a further hearing and determination of the facts.

As to the subitems under Item I, amounts paid as additional compensation and for expenses, and as to Item X, payment of additional compensation, the findings of the Commission are disapproved and the order disallowing these items is reversed with directions to allow these items. As to Items IX, XI and XIII, the findings of the Commission are disapproved, and the order as to these items is reversed with directions for further and not inconsistent proceedings. As to the remaining items, the order of the Commission is affirmed. Affirmed in part, in part reversed, and in part reversed and remanded for further and not inconsistent proceedings.

WALLER, Circuit Judge (concurring in part and dissenting in part).

934

I dissent only to that portion of the opinion which holds that the petitioner was not entitled to include in the "actual, legitimate cost" of the project the money paid the State of Alabama for 106 acres of land.

It is conceded that the petitioner was required to have the 106 acres because same would be flooded by waters created by the dam. It is conceded that there was no fraud nor collusion in the acquisition of these lands from the State, and although it appears from the testimony that the price of $1,000 per acre was entirely out of proportion to the market value of the land in question, nevertheless, $1,000 an acre represents the *actual* cost of the land and there is nothing illegitimate in the transaction whereby a public utility pays to the State of its creation more than the actual market value of lands which it was required to have and which, in the exercise of its business judgment, it preferred to acquire by purchase rather than the doubtful, long-drawn-out and expensive process of condemnation—conceding that the right of the Power Company to condemn State lands or to sue the State without its consent exists.

It should be borne in mind that the petitioner here was operating and trying to do business under dual sovereignties. It should not be forgotten that good business judgment required it at least to exercise every reasonably possible means of doing business amicably with the State of its domicile and its creation. It should not be forgotten that its properties in the State of Alabama were subject to taxation. It should not be forgotten that the State of Alabama still had such powers over the corporation as were not preempted by the scope of Congressional legislation and power. It appears without dispute that the then Governor of Alabama considered its site available and appropriate for the generation of hydro-electric power for the use of other properties of the State of Alabama in that vicinity. Neither the Commission nor the Court should lose sight of the fact that a public utility of the nature of the petitioner is expected to undertake to create and maintain good will in the State and to conduct its business in harmony with the State, and its agencies, in which it does business, and it is a matter of common practice for corporations of the size and character of the petitioner to make concessions to the build-ing of good will, not only with the local and State officials, but with the citizens of the community and to incur a legitimate and justifiable expense to that end. The failure of other and similar corporations to establish and maintain such a policy, but on the contrary to ignore it, is one of the reasons why stringent legislation was necessarily enacted for their regulation. Even though we conceded that the Federal Power Commission and this Court has the right to conclude that the Governor of the State of Alabama was high-jacking the petitioner, nevertheless, there is no proof in the record that payment of the sum demanded by the State under the circumstances was not the exercise of prudent judgment, and certainly the price paid was *actual* and *legitimate*.

I do not think that either the Commission or the Court should lose sight of the fact that, in this particular, the petitioner was between the State and Federal Governments—the upper and nether millstones, if you please. The expenditure was admittedly made in good faith and in the exercise of what the management thought was prudent business. It seems to me that the Court should be concerned not so much with the amount of the expenditure as its actuality and legitimacy. The price paid was not a donation to charity but was the consideration paid for property which the Company had to have. The fact that its judgment was misguided in the manner, or method, of acquisition does not render the expenditure illegal.

I concur in the statement of Commissioners Draper and Manley in reference to this feature of the case wherein they say:

"With regard to the item representing the amount paid to the State of Alabama for two parcels of land within the reservoir area, the evidence shows unequivocally that the State demanded and the Company paid $1,000 per acre for land which was indispensable to the project.

"It has always been my position that the best evidence of the actual cost of anything is the price which was demanded and paid therefor, in the absence of fraud, collusion, etc. And *in determining the actual cost, it is my belief that we should not be concerned with value unless there is doubt as to the good faith of the transaction under scrutiny or indication of*

*flagrant lack of good business judgment. Neither of these two elements is present here.* In fact, the evidence shows that the Company made long-continued efforts to bring about a reduction in the price asked, but to no avail, and that the possibility of a condemnation suit was carefully weighed and rejected because of the inadvisability of undertaking an adversary proceeding against the State in which the Company was domiciled and under whose laws it was doing business." (Emphasis added.)

The Court remanded the case for a determination of the price for which the lands could have been acquired in condemnation. I know of no way to determine that fact except by a proceeding in condemnation which certainly could not be maintained now. It seems to me that what the verdict of a jury or commissioners might have been in a condemnation suit is entirely unpredictable. The old saying that "You can't tell when a mule will kick, how a jury will decide, and whom a woman will marry", is applicable.

I concur in the other conclusions of the Court and dissent in the above particular only.