The **PULLMAN COMPANY,** Plaintiff-Appellant,

v.

The **GREAT NORTHERN RAILWAY COMPANY and the Northern Pacific Railway Company, Defendants-Appellees.**

Nos. 74–1493, 74–1494.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 23, 1975.

Decided April 17, 1975.

Rehearing and Rehearing En Banc Denied May 21, 1975.

Hamilton Smith, Chicago, Ill., for plaintiff-appellant.

James J. Flynn, Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, and SWYGERT and SPRECHER, Circuit Judges.

SPRECHER, Circuit Judge.

The question presented by this appeal is whether separation payments made to terminated employees by The Pullman Company by reason of the cessation of its sleeping car operations constitute "operating expenses" to be borne by railroads which had contracted to use sleeping car service.

I

George M. Pullman organized the Pullman Palace Car Company in 1867, which built Pullman sleeping cars and operated them under contracts with railroads. In 1899 the company became The Pullman Company; in 1924 Pullman Car & Manufacturing Corporation was formed to operate the manufacturing business; in 1927 Pullman Incorporated was created as a holding company, holding all of the stock of Pullman Car & Manufacturing Corporation (which in 1934 became Pullman-Standard Car Manufacturing Company) and all except a small fraction of the stock of The Pullman Company.

In a suit filed by the United States, the District Court for the Eastern District of Pennsylvania, finding that a monopoly existed in violation of Section 2 of the Sherman Act, entered a decree on May 8, 1944 requiring Pullman Incorporated to divest itself of either the manufacturing business conducted by Pullman-Standard or the sleeping car business conducted by The Pullman Company.

Pullman Incorporated elected to divest itself of its interest in the sleeping car business and the properties used in connection therewith. On June 30, 1947, the stock of The Pullman Company was sold to 59 railroads, who purchased the same percentage of Pullman Company stock as their percentage of total Pullman car use during the year 1940.

The Interstate Commerce Commission approved the stock sale to the railroads

and also the execution by Pullman of agreements with each of the railroads utilizing its service in the form of a "Uniform Operating Contract," pursuant to which Pullman operated and serviced sleeping cars, received fares paid by Pullman patrons, and pooled and allocated revenues and expenses among the railroads which used Pullman's services. Proposed Pooling of Railroad Earnings and Service Involved in Operation of the Pullman Company under Railroad Ownership, 268 I.C.C. 473 (1947).

The Uniform Operating Contract provided that if in any contract year total gross earnings were less than Pullman's "Expenses of Operation," the railroads would pay Pullman the amount of the deficiency. "Expenses of Operation" were defined to include "all of Pullman's expenses of conducting its sleeping car business and commissary services," except income taxes, and except the cost of operating air conditioning equipment which cost would be paid directly by each railroad instead of being pooled.

The Interstate Commerce Commission concluded that these provisions required the contracting railroads to assure the operating expenses of the "joint enterprise" by participating "in a guaranty against operating losses by Pullman." *Id.* at 479.

Effective July 1, 1949, the Uniform Operating Contract was replaced by the "Uniform Service Contract," which provided in Section 7(c) that "[i]f for any Contract Year the expenses allocated to the Railroad plus the 3% return on Pullman's investment allocated to the Railroad shall exceed the revenues allocated to the Railroad, the Railroad shall pay to Pullman the amount of the deficiency." The Contract specified that "[e]xpenses to be accounted for under this contract shall include the following: (A) Operating Expenses, (B) Taxes other than Federal Taxes on Income, (C) Rental for Cars."

An amendment to the Uniform Service Contract, Appendix A, became effective January 1, 1956 and provided in part that "[a]ctual expenses shall be segregat-

ed into the following [ten] general cost groups," including such items as "Car Repairs," "Conductors" and "Porters." Appendix A also provided that:

Each of the above groups shall include direct and indirect expenses pertaining thereto, as well as appropriate proportions of district and general administrative expenses and taxes, other than Federal taxes on income, as provided for in Pullman's "Classification of Accounts," as prescribed by the Interstate Commerce Commission.

This Classification of Accounts is also known as Pullman's System of Accounts, establishing several categories of accounts, including property accounts, revenue accounts, expense accounts, income accounts, earned surplus accounts and balance sheet accounts. Each category contains accounts in which specific items are to be included. The System of Accounts also established various clearing accounts.

The separation payments involved in this appeal were charged by Pullman to a clearing account, 6–22, General Administration, which included "[p]ensions and relief expenses not otherwise provided for; . . . and other expenses."

During the years following World War II, travel in the United States increasingly moved by automobile and airplane at the expense of the railroads. Under the Uniform Service Contract, a railroad had the right to withdraw wholly or partially from the Contract and to assume the functions theretofore served by Pullman.

A complete withdrawal, for which six months' written notice to Pullman was necessary, required the particular railroad to furnish and operate its own sleeping cars and maintain them in shops of its own choosing. A partial withdrawal, for which a 60 days' written notice to Pullman was customarily given, required the particular railroad to operate sleeping cars with its own conductors and porters, while continuing to obtain cars from and having them maintained and shopped by Pullman.

On July 1, 1958, the New York Central Railroad withdrew completely from Pullman service on most of its lines. In 1967 and 1968, several roads withdrew partially, and these and most of the other roads were in the process of considering complete withdrawal.

The chief executives of the Pullman contract railroads met in Boca Raton, Florida, on January 31, 1969, to consider a uniform withdrawal date. The two principal executives of Pullman attended the meeting. At the meeting all the contract railroads, including the two defendant railroads, The Great Northern and The Northern Pacific, and the Burlington which they jointly owned, indicated their decision to withdraw completely effective August 1, 1969. At that time it became certain that the rendition by The Pullman Company of a sleeping car service would come to an end and that Pullman would go out of business. Shortly after the Boca Raton meeting, all of the remaining contract railroads gave notice of complete withdrawal effective as of August 1, 1969.

Throughout the period of declining railroad and Pullman business, the railroad unions began to negotiate for job termination agreements with the railroads.

On May 21, 1936, most of the railroads had executed the so-called Washington Job Protection Agreement with the Order of Railway Conductors whereby conductors who lost their jobs as the result of a consolidation, merger or pooling of facilities would receive 60 percent of their compensation for a period up to five years, or, in the alternative, a lump-sum separation allowance. On December 9, 1963, the conductors entered into the Wolfe-Wise Agreement, subsequently ratified by 31 railroads including The Great Northern and The Northern Pacific, whereby a conductor who lost his job as the result of the withdrawal of a Pullman contract railroad had the option of receiving 60 percent of his compensation for up to 24 months or the lump-sum separation allowance provided in the Washington Job Protection Agreement.

The Brotherhood of Sleeping Car Porters entered into the Wolfe-Randolph Agreement on December 17, 1963, subsequently ratified by 33 railroads, including The Great Northern and The Northern Pacific, whereby porters offered employment by a withdrawing Pullman contract railroad would retain the same employment rights they had at Pullman but receive no separation pay in the event of the loss of their jobs.

The six shopcraft unions obtained an agreement from the railroads on September 25, 1964, extending the Washington Job Protection Agreement to discontinuances of services. The Brotherhood of Railway and Steamship Clerks obtained an agreement from the railroads on February 7, 1965, extending certain separation rights to clerks.

The railroad unions then began to negotiate for job termination agreements with The Pullman Company. The porters and clerks made the first demands on Pullman.

On March 13, 1968, Pullman sent a letter to the chief executives of the Pullman contract railroads, advising that it would enter into separation pay agreements with the porters and clerks if railroads which together incurred more than 50 percent of Pullman's 1967 expenses of operations approved its doing so. It indicated that any expenses incurred pursuant to the agreements, if executed, would be charged to the contract railroads in proportion to their 1967 percentage of Pullman's operations. In response, none of the contract railroads, including The Great Northern or The Northern Pacific, objected to the indicated method of allocating the separation pay expenses. Contract railroads, including The Northern Pacific, which together incurred 91.2464 percent of Pullman's 1967 expenses of operations, approved Pullman's execution of the agreements. The Great Northern did not approve.

Therefore, on May 27, 1968, Pullman entered into substantially identical separation pay agreements with the porters and clerks. The agreements provided

that employees in active service with Pullman on November 13, 1967, would receive a lump-sum separation allowance of $2,500 from Pullman if they accepted employment by a railroad and nothing if they refused such employment. Furloughed employees would receive separation pay equal to 360 days' pay, depending on their length of service.

After demands by the conductors, Pullman submitted a draft of a separation pay agreement involving the conductors to the contract railroads for approval. Railroads, including The Northern Pacific, which together incurred 65 percent of Pullman's 1968 expenses of operations, approved Pullman's execution of the agreement. The Great Northern disapproved. Thus, Pullman on September 11, 1968, executed a separation pay agreement with the conductors which was patterned after the porters' and clerks' agreements. In submitting the agreement to the railroads, Pullman stated that expenses incurred pursuant to the agreement would be charged to the contract railroads in proportion to their 1968 percentages of Pullman's expenses of operations. None of the responses to Pullman, including those of The Great Northern and The Northern Pacific, expressed any objection to the charging of expenses to the contract railroads.

Pullman had entered a partial separation pay agreement with the six shopcraft unions on July 19, 1966. Following the porters' and clerks' agreements, the shopcrafts demanded equal separation pay benefits. On January 16, 1969, Pullman entered into an agreement with the shopcraft unions, which was similar to the porters' and clerks' agreements except that it did not provide for the transfer allowance of $2,500. Railroads accounting for 74.5535 percent of the Pullman operating expenses for the first six months of 1968 approved of the modified agreement with the shopcrafts.

On January 29, 1969, Pullman executed a separation pay agreement with its supervisors through the American Railway Supervisers Association. This agreement was similar to that executed with the shopcrafts and had been part of the solicitation of and approval by a majority of the contract railroads of the shopcraft agreement.

In June 1967, Pullman had entered into employment contracts with 21 of its executives and key employees, which required Pullman to maintain various benefits. On November 4, 1968, the board of directors of Pullman approved a resolution that its non-union employees be paid the pattern separation allowance. Pullman did not enter into a separation pay agreement with United Transport Service Employees, representing its laundry workers.

In regard to the separation pay negotiations and agreements, the district court made the following significant finding of fact:

Pullman's negotiations with respect to each separation pay agreement it entered into were at arm's length. On each occasion on which Pullman committed itself to making separation payments, there was no decision to cease the operations involved and Pullman acted with the reasonable expectation that in its operations there would be a need to employ the group of employees to whom it agreed to pay the separation allowances, although the duration of that need was not clear.

During the period June 1968 to October 1971, Pullman made separation payments to its employees totalling $15,647,461.05 in accordance with the various agreements and the board resolution of November 4, 1968. It billed the separation pay expenses to the Pullman contract railroads as operating expenses in proportion to their respective shares of Pullman's operating expenses in the years in which the separation pay liabilities were incurred.

The amount billed by Pullman to The Great Northern for separation pay and not paid was $537,630.22. The amount billed to The Northern Pacific and not paid was $458,282.17.

Pullman brought suit against The Great Northern and The Northern Pacific to recover the separation pay expenses not paid. Each railroad in turn filed a three-count counterclaim seeking to recover separation pay expenses previously billed by Pullman and paid by each road. The foregoing is a summary of the district court's 62 findings of fact, none of which are disputed by the parties.

## II

The complaint against The Great Northern (Count I) and The Northern Pacific (Count II) as well as Count I of the counterclaims of each of those roads raised essentially the same issues and were disposed of together by the district court, which phrased the issues as follows:

> Pullman's theory is that under the Uniform Service Contract the railroads were obligated to pay all operating expenses and that, since the separation pay agreements were entered into at a time when there was a need for the employees and were necessary to avert strikes, the costs associated with those agreements are reimbursable operating expenses.
>
> . . . Great Northern and Northern Pacific have taken the position they are under no obligation to reimburse Pullman for separation payments that were made once it was determined not to operate or to cease Pullman sleeping car operations in the United States or to litigate, dissolve or cause the cessation of such operations.

As noted in part I, *supra*, the district court found that the final separation pay agreements were entered into with the various groups of Pullman employees upon the following dates:

Porters and Clerks — May 27, 1968
Conductors — September 11, 1968
Non-union — November 4, 1968
Shopcrafts — January 16, 1969
Supervisors — January 29, 1969

The court further found that the decision to cease all operations and to liquidate Pullman was made at the Boca Raton meeting on January 31, 1969, a date subsequent to the conclusion of all separation pay agreements. Consequently, the court found that "at the time each of the separation pay agreements was entered into, there had been no decision to terminate the operations involved and that there was a need to employ the group of employees to which it was agreeing to pay the separation allowances."

The Interstate Commerce Commission in 1947 had approved the operating agreements between Pullman and the contracting railroads, characterizing the agreements as follows:

> The contract would make an important change from the present arrangement, due to the fact that in the future each contracting railroad would have to participate in a guaranty against operating losses by Pullman.

268 I.C.C. at 479.

Both The Great Northern and The Northern Pacific were applicants in that proceeding seeking approval of the agreements. *Id.* at 493. The Order of Railway Conductors had intervened and expressed concern over the possible effect of the changes on Pullman employees.

In reassuring the employees, the Commission pointed out that the District Court for the Eastern District of Pennsylvania, in approving the sale of Pullman stock to the railroads on January 4, 1946, had ordered:

> This order is made without prejudice to the rights of the employees of the Pullman Company under existing contracts and practices.

*Id.* at 494.

The Commission further mollified the Pullman employees by noting:

> In October 1945 the railroad buying group gave the following assurance in writing, which was repeated in their intervening petition in the district court and is reiterated in this record by the applicants:
>
> > The Pullman Company under its railroad ownership will faithfully

perform and keep the obligation and commitments to labor under the outstanding agreements and practices according to the law of the land . . . .

*Id.* at 491.

At that time the railroads had already executed the 1936 Washington Job Protection Agreement with the conductors, providing for separation allowances. Thus, there was nothing extraordinary in The Pullman Company's negotiating and eventually executing the separation pay agreements of 1968 and 1969. Furthermore Pullman obtained the express approval of the railroads which incurred more than 50 percent of its expenses of operations prior to executing each of the separation pay agreements.

The district judge found that the term "operating expenses" is not defined in the Uniform Service Contract. He then held that in the absence of either a definition in the contract or an established legal definition and that "since it is a term of art within the accounting profession and it appears that the parties intended to use it in that sense, parol evidence of usage within the profession is appropriate when the term is capable of a definite interpretation."

Having heard some expert testimony,* however, the district judge observed:

> While accountants are in general conceptual agreement about the term "operating expenses," there is considerable subjectivity involved in the decision as to when the separation payments here ceased being operating expenses chargeable to surplus. In short, custom and usage within the accounting profession is not uniform and does not provide definite standards; accordingly, expert opinion carries less weight in construing the par-

ties' intent than might otherwise be the case.

The district judge then concluded:

> This Court is of the opinion that once it became clear that Pullman was going to discontinue a segment of its business, separation payments to employees in that segment of its operations were no longer operating expenses chargeable to the contract railroads.

> For porters, conductors and others associated with operations of the cars, . . . the cut-off date for charging the expenses to the railroads would be October 28, 1968. . . . The cut-off date for employees not in the above category would be January 31, 1969.

The reference to October 28, 1968 pertains to the court's finding that "[b]y October 28, 1968 railroads using a substantial majority of Pullman's sleeping car services had either served or intended to serve notices of partial withdrawal effective January 1, 1969."

Accordingly, the court entered judgment in favor of Pullman for those separation payments made to the respective groups of employees before the cut-off dates and in favor of Great Northern and Northern Pacific for any payments made to Pullman in respect to separation payments after the cut-off dates. As a result judgment was entered in favor of Great Northern for $183,513.16 plus costs and in favor of Northern Pacific for $158,844.49 plus costs.

### III

We affirm and adopt the district court's findings of fact numbered 1 through 62. We part with the court in some of the conclusions it reaches in applying those facts.

---

* The district court drew the following conclusion:

> Among accountants, there appears to be a generally accepted definition of operating expenses. The term includes those expenses incurred in the conduct of the major activities of a business which are generally recurrent in nature and somewhat normal and dependable in their operation. A non-operating expense is one which is not incurred directly in the conduct of the normal or major operations of the business, does not recur at regular intervals, and is more or less fortuitous in its occurrence.

In the first place, the court disposed of the basic documents we are interpreting in too summary a fashion.

Article IV, Section 1(c) of the original Uniform Operating Contract, which had been approved by the Interstate Commerce Commission, provided that:

> If, for any contract year, the total gross earnings of all sleeping cars operated under the terms of this contract shall be less than the total amount of Pullman's "Expenses of Operation" of such cars . . ., the Railroad shall pay to Pullman the amount of the deficiency.

Article IV, Section 3 provided in part:

> Except as herein otherwise provided, the term "Expenses of Operation" as used in this contract shall include all of Pullman's expenses of conducting its sleeping car business . . . and also including but not limited to the various items elsewhere herein expressly provided to be included in "Expenses of Operation"; . . ..

Article V, Section 1 provided in part that "[t]his contract shall be construed liberally so as to secure to each party all the rights, privileges and benefits herein provided or manifestly intended. . ."

The later adopted Uniform Service Contract provided in Section 7(c):

> If for any Contract Year the expenses allocated to the Railroad plus the 3% return on Pullman's investment allocated to the Railroad, shall exceed the revenues allocated to the Railroad, the Railroad shall pay to Pullman the amount of the deficiency.

In an appendix the Uniform Service Contract specified that "[e]xpenses to be accounted for under this contract shall include the following: (A) Operating Expenses . . .." The Contract appendix provided that "[a]ctual expenses shall be segregated into the following [ten] general cost groups" and that "[e]ach of the above groups shall include direct and indirect expenses pertaining thereto, as well as appropriate proportions of district and general administrative expenses . . .."

In a book dealing with accounting and the law it was said that:

> The cost of direct labor has long been recognized as a basic cost chargeable directly to the particular product or service with which it is associated. For legal and accounting purposes, the cost of direct labor is not limited to wages paid, but embraces within its meaning various direct economic benefits to workers flowing from the employment relationship.

> \* \* \* \* \* \*

> Direct items have been identified and distinguished from indirect labor and from general and administrative expense, particularly in decisions as to reimbursement under contracts of the cost-reimbursable type. Thus, included in cost of direct labor in addition to wages are overtime premium pay, vacation pay, pay for "coffee breaks" and holidays not worked, pay for travel time, standby pay, severance pay, and incentive pay.

G. Hills, The Law of Accounting and Financial Statements 194–97 (1957).

The parties have not directed us to any case, nor have we found one, which is directly on point, but there are many cases which shed light on the probable intention of the parties to the Uniform Service Contract when they used the terms "operating expenses," "actual expenses," and "direct expenses."

In holding that "back pay" shall be treated as "wages" under the Social Security Act, the Supreme Court pointed out that "dismissal pay" constitutes wages. Social Security Board v. Nierotko, 327 U.S. 358, 366, n. 17, 66 S.Ct. 637, 90 L.Ed. 718 (1946). Wages, in turn, are direct labor expenses.

The Second Circuit held in Carragan v. Commissioner, 197 F.2d 246, 248 (2d Cir. 1952), that a severance allowance upon liquidation of the employing corporation was additional compensation to the employee for past services and not a tax-free gift. Earlier the Second Circuit had held that "retiring allowances" constituted taxable income as one form of compensation for personal service. Hooker

v. Hoey, 27 F.Supp. 489 (S.D.N.Y.), aff'd, 107 F.2d 1016 (2d Cir. 1939).

In Inland Steel Co. v. NLRB, 170 F.2d 247 (7th Cir. 1948), we held that an employer must bargain with respect to retirement or pension plans since they fall within the National Labor Relations Act's language of "pay, wages, hours of employment or other conditions of employment." The Supreme Court denied certiorari upon the pension issue in 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949), and affirmed the balance of the opinion in American Communications Ass'n v. Douds, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925 (1950).

In Alabama Power Co. v. FPC, 134 F.2d 602 (5th Cir. 1943), in determining reimbursable construction costs under the Federal Power Act, the Fifth Circuit held that bonuses to employees are "often considered good business as tending to satisfy employees with their wages, and as an incentive to greater effort. . . . [The bonuses] were paid for labor, and not from philanthropy, and ought to be included with the wages they supplemented, as construction costs." *Id.* at 610.

In summary, the railroads, with the approval of the Interstate Commerce Commission, agreed "to participate in a guaranty against operating losses by Pullman." 268 I.C.C. at 479. In the original Uniform Operating Contract, approved by the Commission, the railroads agreed to pay Pullman "all of Pullman's expenses of conducting its sleeping car business and commissary services." In the subsequent Uniform Service Contract, also approved by the Commission, the railroads agreed to pay Pullman's expenses including "operating expenses" and "actual expenses," which include "direct and indirect expenses."

Pullman had been placed on notice by the District Court for the Eastern District of Pennsylvania in 1946 and by the Commission in 1947 to observe the rights of its employees, which by then already included in regard to conductors separation allowances under the 1936 Washington Job Protection Agreement. Beginning as early as 1960, the various unions pressed for expanded separation pay rights. The Great Northern and The Northern Pacific joined with most of the railroads in granting separation pay allowances in 1963 to the conductors and porters, in 1964 to the shopcrafts and in 1965 to the clerks.

After succeeding with the railroads, the unions pressed Pullman to enter into similar separation pay agreements. Pullman executed the various agreements in 1968 and early 1969 only after the threat of strikes by each union (findings 41, 46, 53, 56) and after the approval by a majority of the railroad users of Pullman service as to each contract. The railroads were advised prior to approving that Pullman intended to charge the separation pay expenses to the railroads in accordance with the Uniform Service Contract and none of them, including The Great Northern or The Northern Pacific, objected.

The district court expressly found that the Pullman negotiations with respect to each separation pay agreement were at arm's length, that each commitment to make separation payments was made prior to the decision to cease operations and that Pullman acted with reasonable expectation that there would be a need to continue to employ each group of employees involved (finding 59).

Pullman charged the separation payments to clearing account 6–22, General Administration, which was part of the System of Accounts approved by the Interstate Commerce Commission on October 4, 1950, and which included "[p]ensions and relief expenses not otherwise provided for . . . and other expenses."

In allied contexts, separation pay has uniformly been considered to be a part of wages and part of direct labor costs. We can only conclude that the separation payments herein involved were intended by the parties to the Uniform Service Contract to be part of "all of Pullman's expenses of conducting its sleeping car business and commissary services" and to be an "operating ex-

**334**

pense" or "actual expense" or "direct expense" of such business.

Insofar as the district court entered judgment in favor of Great Northern and Northern Pacific against Pullman in respect of separation payments, the judgment is reversed and the cause remanded with directions to enter judgment in favor of Pullman and against Great Northern and Northern Pacific as sought in Counts I and II of the complaint and under Count I of the respective counterclaims. We affirm the judgments in favor of Pullman and against Great Northern and Northern Pacific under Counts II and III of the counterclaims for the reasons expressed by the district court.

Reversed in part; affirmed in part.

FAIRCHILD, Chief Judge (dissenting in part).

I respectfully dissent, in part.

It seems to me that Judge McLaren's definition of an operating expense as an expense "incurred in the conduct of the major activities of a business which [is] generally recurrent in nature and somewhat normal and dependable in [its] operation" is reasonable. I agree that the cost of separation pay is an operating expense to an on-going business, but here the expense has become a cost of liquidation. Such cost ought to be borne by the company's shareholders in proportion to their ownership interests, not in proportion to their use of the company's assets.

Pullman's treatment of liabilities arising from executive employment contracts and under group insurance and pension plans confirm the soundness of this distinction. Both the executive employment agreements, which in substance provided protection in the event the business terminated, and the employee insurance and pension plans were executed to attract and retain qualified employees to run Pullman's operation. Yet, once it was decided to liquidate the business these liabilities were quite properly charged to surplus. I can see no meaningful distinction between these ex-

penses and the separation allowances the majority now deems to be "operating expenses."

Accordingly, I would affirm the judgment of the district court in all respects.